FILED
DALLAS COUNTY
4/3/2015 2:23:18 PM
FELICIA PITRE
DISTRICT CLERK

Crystal McDowell

2 CIT/ESERVE

## CAUSE NO. DC-14-08017

| | | |
|---|---|---|
| STEPHANIE D. CURTIS, and CURTIS RESTAURANT HOLDINGS, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | 162nd JUDICIAL DISTRICT |
| MP CONCEPTS 2, LLC; EXPRESS WORKING CAPITAL, LLC; WORLD PAY US, INC; BRADLEY D. WOY; and JOE WOMACK | § § § § § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## SECOND AMENDED PETITION

**TO THE HONORABLE PHYLLIS LISTER BROWN:**

COME NOW, Plaintiffs STEPHANIE D. CURTIS and CURTIS RESTAURANT HOLDINGS, LLC and file this Second Amended Petition complaining of Defendants MP CONCEPTS 2, LLC; EXPRESS WORKING CAPITAL, LLC; WORLDPAY US, INC.; BRADLEY D. WOY; and JOE WOMACK (the "Petition"), and in support of said Petition would respectfully show the Court the following:

### I.   DISCOVERY CONTROL PLAN

Plaintiffs STEPHANIE D. CURTIS ("CURTIS") and CURTIS RESTAURANT HOLDINGS, LLC ("CRH") intend to conduct discovery under Level 2 pursuant to Rule 190.3 of the Texas Rules of Civil Procedure.

---

SECOND AMENDED PETITION                                                                                    PAGE—1

Exhibit A-1

## II.    PARTIES

1.      Plaintiff CURTIS is an individual residing and doing business in Dallas, Texas.

2.      Plaintiff CRH is a Texas limited liability company whose registered office is located in Dallas County, Texas.

3.      Defendant MP CONCEPTS 2, LLC ("MP2") is a Texas limited liability company doing business in Texas.  MP2 has entered an appearance and answered this lawsuit by and through counsel.

4.      Defendant EXPRESS WORKING CAPITAL, LLC ("EWC") is a Delaware limited liability company doing business in Texas.  EWC has entered an appearance and answered this lawsuit by and through counsel.

5.      Defendant WORLDPAY US, INC. ("WORLDPAY") is a Georgia corporation whose principal place of business is located at 600 Morgan Falls Road, Atlanta, Georgia  30350-5810, has entered an appearance and answered this lawsuit by and through counsel.

6.      Defendant BRADLEY D. WOY ("WOY") is an individual residing and doing business in Dallas County, Texas. WOY is the owner and managing member of EWC.  WOY may be served at 4890 Alpha Road, Suite 200, Dallas, Texas  75244 or wherever else he may be found.

7.      Defendant JOE WOMACK ("WOMACK") is an individual residing and doing business in Dallas County, Texas and may be served at 4890 Alpha Road, Suite 200, Dallas, Texas  75244 or wherever else he may be found.

Exhibit A-1

### III.    JURISDICTION AND VENUE

8.    Dallas County is the proper venue for this lawsuit because:

    a.    all or substantially all of the acts and/or omissions giving rise to Plaintiffs' causes of action occurred and/or accrued in Dallas County, Texas; and

    b.    EWC's and MP2's principal place of business is located in Dallas County, Texas.

Therefore, venue in this action is proper in Dallas County, Texas pursuant to section 15.002(a) of the Texas Civil Practice & Remedies Code.

9.    Plaintiffs seek avoidance and recovery of transfers and equitable and monetary relief for damages in an amount over $267,000, which is within the jurisdictional limits of the Court.

10.    In accordance with Rule 47 of the Texas Rules of Civil Procedure; Plaintiffs state that they seek monetary relief of over $1,000,000.00.

### IV.    FACTS

**WOY SEC Indictment & Permanent Injunction**

11.    On February 28, 2001, the Securities and Exchange Commission ("SEC") filed a civil action against Smart-Mart, Inc. ("Smart-Mart"); Timothy A. McMurray ("McMurray"); and WOY for a fraudulent securities offering in connection with Smart-Mart, Inc. (the "Complaint"). The Complaint, filed in the United States District Court for the Northern District of Texas, alleged that from March 1998 through February 1999, WOY and McMurray raised approximately $2.4 million from approximately 720 investors located throughout the United States and Canada through the sale of common stock in a purported private placement offering for Smart-Mart. A true and correct copy of the SEC Litigation Release No. 16917 is attached hereto as "Exhibit 1," and is incorporated by reference as if fully set forth herein.

Exhibit A-1

12.     In connection with these sales, Smart-Mart, McMurray and WOY knowingly made false and misleading statements to investors regarding an impending initial public offering ("IPO"), the business prospects of Smart-Mart, the use of investor funds, and the liquidity and return on investment.  In addition, McMurray failed to disclose critical information regarding his background and experience.   Notwithstanding these representations, neither WOY nor McMurray ever took any significant steps to conduct an IPO for Smart-Mart and the company had minimal business operations.  Moreover, Smart-Mart's financial and other business records reveal that McMurray and WOY used a large portion of investor funds for unauthorized business and personal expenses.

a.     Smart-Mart, Inc., a former Texas corporation located in Dallas, Texas, was incorporated on September 22, 1997.

b.     Timothy A. McMurray, was a resident of Dallas, Texas, was a founder of Smart-Mart and was the president, CEO and chairman of the board until he resigned in October 1998. McMurray was convicted of bank fraud for a check-kiting scheme in January 1993, and was sentenced to five years probation.

c.     WOY was promoted to the president, CEO and chief operating officer of Smart-Mart following McMurray's resignation.

13.     As a result of its lawsuit, the SEC, in October 2002, succeeded in obtaining permanent injunctive relief against WOY, enjoining him from future violations of Sections 5(a), 5(c) and 17(a)[1] of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder[2] ("SEC Injunction").  Further, WOY was ordered to pay disgorgement of $25,000.  A true and correct copy of said SEC Litigation Release No. 18342 is attached hereto as "Exhibit 2," and is incorporated by reference as if fully set forth herein.

---

[1] 15 U.S.C. §§77e(a), 77e(c) and 77q(a).
[2] 15 U.S.C. §78j, *et al.*

Exhibit A-1

14.     On July 23, 2003, WOY was indicted on 49 counts of securities fraud and other offenses. As a result of the 49-count indictment, Defendant WOY was ultimately sentenced to 32 months custody, followed by a 2-year term of supervised release, and ordered to pay $789,000.00 in restitution (the "Sentence"). A true and correct copy of the Sentence is attached hereto as "Exhibit 3," and is incorporated by reference as if fully set forth herein.

15.     WOY's supervised release began on August 31, 2007. Under supervised release WOY was subject to certain special conditions ("Special Conditions"), including, but not limited to, "refrain[ing] from incurring new credit charges or opening additional lines of credit without approval … ." and he was "not to enter into any self-employment while under supervision without prior approval … ." *See* Exhibit 3, pg. 4.

**WOY's Violation of the Permanent Injunction and Special Conditions**

16.     Within two months of his release and despite the Permanent Injunction, Sentence and Special Conditions, on October 31, 2007, WOY began operating a new business that loaned money to restaurants with a $50,000.00 investment and a line of credit from Texas Capital Bank, and formed EWC. See August 2011 D Magazine Article attached hereto as "Exhibit 4,") and is incorporated by reference as if fully set forth herein. EWC is a Delaware limited liability company and, on information and belief, WOY began operating EWC in contravention of the aforementioned Special Conditions of his release.

17.     EWC is in the business of advancing cash it obtains from loans, lines of credit and investors, to restaurant merchants ("Merchants") in need of fast cash in exchange for taking a percentage of the Merchant's future credit card receipts and disingenuously labeling the Merchant's revenue as "future receivables" under a loan agreement ("Future CC Sales Loan Agreement"). As a means of securing repayment, the Merchants must provide an irrevocable

Exhibit A-1

authorization to an EWC approved third-party credit card processor, such as WORLDPAY, that directs the processor to remit a daily percentage of the Merchant's receipts directly to EWC.

18.    Under the terms of the Future CC Sales Loan Agreement, EWC reserves the right to sell interests in the projected future cash flows expected to be received under its various loan agreements with its restaurant clients ("Participation Interest").

19.    Upon information and belief, in order to raise additional capital for reinvestment, EWC bundles, or securitizes, several of the so called "Future Receivables Sales Agreements" together to sell to investors ("Participation Agreements"). Based on the foregoing activities, beginning only sixty (60) days from WOY's release from the Federal Correctional Institution through the present, WOY has continued to act in violation of the SEC Permanent Injunction.

**WOY and EWC Acquire PRS after $5.45 million of Payroll Tax Evasion**

20.    Just a few years later WOY and EWC acquired Preferred Restaurant Services, LP, after PRS had committed over $5 million of tax evasion. Preferred Restaurant Management Services, LP ("PRMS") was a company that provided consulting and other back-office services to restaurants, including, but not limited to, payroll processing services for a company known as Preferred Restaurant Services, LP ("PRS"). PRS would obtain restaurant clients and perform payroll processing, through PRMS, and provide group health insurance to its client's employees. PRMS was owned and controlled by Brian M. Black ("BMB"), its President. On April 29, 2011, as a result of PRMS and Black's mismanagement of PRS's payroll obligations, namely failure to remit in excess of $5,400,000.00 to the Internal Revenue Service for payroll tax obligations, the Federal Government placed a tax lien on certain assets belonging to PRS's former controlling partner.

Exhibit A-1

21.     To bail out PRMG and PRS, WOY and EWC purchased PRS and began managing the payroll processing of PRS's former clients. The whereabouts of the missing $5.4 million dollars appear to still be unknown to the IRS.

**EWC's Loan to BMB and Failed OCHO**

22.     EWC advanced $150,000.00 to BMB as the operator of Ocho Kitchen and Cocktails ("OCHO"). EWC, OCHO and BMB executed a Future CC Sales Loan Agreement, dated December 14, 2012, whereby BMB personally guaranteed the loan ("OCHO Agreement"). Under the OCHO Agreement, EWC would advance $150,000.00 to OCHO, OCHO would install WORLDPAY point-of-sale ("POS System") machines to process all of OCHO's credit card transactions and its operator BMB would sign an irrevocable authorization directing WORLDPAY to remit 12% of all credit card transactions to EWC until the amount of $202,050.00 had been paid. Within months OCHO failed under the mismanagement of BMB.

23.     Following the failure of OCHO, EWC, desperate to recoup the unpaid funds advanced under the OCHO Agreement, conspired with BMB, Sonia M. Black ("SMB") and WORLDPAY to obtain a remittance of settlement funds from a new restaurant started with outside funding in order to be repaid.

24.     In May 2013, with the pattern of conduct described in the foregoing unbeknownst to CURTIS, BMB approached CURTIS about financing a new restaurant venture in Dallas, Texas under the trade-name Mi Piaci Cucina Italiana ("Mi Piaci"). Then, on May 31, 2013, CRH was formed for the purpose of holding a membership interest in MP2, which in turn, was formed on June 7, 2013, for the purpose of operating Mi Piaci. CURTIS was a 50% manager of MP2. BMB was also a 50% manager of MP2.

Exhibit A-1

25.    *Due to WORLDPAY's previous integration into failed OCHO's POS System, and MP2's purchase of the OCHO POS System in place, WORLDPAY continued to process MP2's credit card sales without first obtaining a credit card processing agreement with MP2. WORLDPAY then remitted 12-15% OF Mi Piaci's revenue to EWC to repay the failed OCHO Agreement and BMB's worthless personal guarantee.[3]*

**MP2 Factual Background**

26.    On June 18, 2013, MP2 contracted with Black Restaurant Management Group, LLC ("BRMG") for restaurant management services ("Management Services Agreement"), including, but not limited to, full time management, service and culinary presence; post opening adjustments to include service, menu, execution, purchasing, and systems; concept evaluation based on comprehensive competition research; menu evaluation- to include costing and pricing; recipe evaluation; management/culinary recruiting and hiring to include operations managers, culinary; develop the annual operating budget for MP2 approval; training manuals development-service, bar and culinary; point of sale system evaluation and advice; floor, kitchen and bar standards development; training schedule development; interviewing and hiring hourly staff and staff training of set standards; vendor relationships; purchases review and execution of food, liquor, beer, wine, non-perishables, and supplies; etc.

27.    BMB controlled BRMG and, therefore, controlled Mi Piaci. Sonia M. Black ("SMB"), who is BMB's spouse, controlled the accounting functions of Mi Piaci without authorization from MP2 or its member CRH or manager CURTIS, and despite CURTIS's attempts to remove SMB from such functions.

---

[3] BMB has owned, managed and/or operated a string of failed restaurants and restaurant consulting groups in Dallas and out of state.

Exhibit A-1

28.    CURTIS was and is a creditor of MP2, loaning MP2 in excess of $200,000 under the "Loan Agreement and Line of Credit" dated June 18, 2013. CURTIS also was a secured lender to MP2, and properly filed a UCC Financing Statement with the Texas Secretary of State on July 18, 2013 (the "UCC Financing Statement"), securing her loan and providing public notice of her perfected liens upon MP2's collateral, including, without limitation, liens upon "[a]ll goods, wares and/or inventory, equipment, fixtures, furniture, improvements, intellectual property, and all other personal property of Debtor and all products and proceeds therefrom whether now in existence or hereafter acquired by Debtor... the name 'Mi Piaci' ... ." A true and correct copy of the UCC Financing Statement is attached hereto as "Exhibit 5," and is incorporated by reference as if fully set forth herein.

29.    In addition to the notice provided by the UCC Financing Statement, MP2 executed a security agreement with CURTIS, which is the actual instrument that created CURTIS's lien against MP2's assets (the "Security Agreement"). A true and correct copy of the Security Agreement is attached hereto as "Exhibit 6," and is incorporated by reference as if fully set forth herein. The Security Agreement indicates that CURTIS has a secured interest in various assets of MP2, including, without limitation:

> "all other personal property and all products and proceeds therefrom whether now in existence or hereafter acquired ... ." *See* Exhibit 6, pg. 1.

> "(ii)    general intangibles (including payment intangibles), money ... monetary obligations, chattel paper (including electronic chattel paper) ... (iii) all cash funds, fees (whether refundable, returnable, or reimbursable) deposit accounts or other funds or evidences of cash ... ." *See* Exhibit 6, pg. 2.

> "(iv) all other personal property of any kind or character as defined and subject to the provisions of the Code (Article 9 – Secured Transactions); and any and all of which are now owned or hereafter acquired ... ." *See* Exhibit 6, pg. 2.

Exhibit A-1

30.    As a result of the Security Agreement, CURTIS held a secured interest in any and all types of payment being received by MP2.

31.    After receipt of CURTIS's funds and perfection of CURTIS's liens, Mi Piaci opened its doors on August 7, 2013. EWC, however, helped itself with the aiding and abetting of WORLDPAY, to Mi Piaci's sales, i.e., CURTIS's collateral, to pay back the loan to failed OCHO.

32.    MP2 routinely generated over $200,000.00 a month in revenue from credit card sales ("Settlement Funds") from the sale of food and drink items to Mi Piaci's customers.  By virtue of the Security Agreement, CURTIS held perfected liens and/or property interests upon said Settlement Funds.

33.    Under the control and direction of WOY, WOMACK and EWC, in concert with WORLDPAY, SMB and BMB opened a merchant account ("Merchant Account") under MP2's federal employee identification number ("FEIN") to facilitate the diversion of funds to EWC and WORLDPAY for the benefit of all Defendants.

34.    Under the control and direction of WOY, WOMACK and EWC directed BMB and SMB to process all of MP2's credit card transactions through WORLDPAY using failed OCHO terminals so MP2's funds could be easily remitted to EWC or an unauthorized Merchant Account without detection.

35.    Without CURTIS's acknowledgement or consent, EWC and WORLDPAY were siphoning off hundreds of thousands of dollars from the Settlement Funds that were and remain subject to CURTIS's lien and/or security interest.  CURTIS estimates that EWC unlawfully obtained approximately $267,000.00 in Settlement Funds that WORLDPAY transferred either directly to EWC and/or to an unauthorized bank account (the "Transfers").  The Transfers were

Exhibit A-1

made in violation of, among other things, the WOY SEC Injunction, the MP2 Company Agreement, Initial Minutes of Organization, the BRMG Management Agreement, CURTIS's Loan Agreement, Security Agreement and Line of Credit, and damaged CURTIS by diverting and converting Settlement Funds upon which she had a lien.

36.    Even more shocking, WOLRDPAY, the credit card processing company, was complicit in the Transfers without either WORLDPAY or EWC having any contractual relationship with MP2, much less a contract that provided for WORLDPAY's processing of MP2's credit cards or the remittance of the Transfers to EWC.

37.    Despite having never advanced any funds to MP2, EWC converted the Settlement Funds to recoup the unpaid advances made under the failed OCHO Agreement with the intent to defraud and with the knowledge that EWC had no contract with MP2, no permission from CURTIS, no authority over Settlement Funds, and with notice of the CURTIS's UCC Financing Statement.

38.    WORLDPAY conspired with, assisted, encouraged, and/or enabled EWC to convert the Settlement Funds by transferring the Settlement Funds from MP2's bank account to EWC without an express written contract with MP2 to perform merchant services for MP2, and without any authority whatsoever to process MP2's credit card receipts, much less transfer those funds to an undisclosed third-party.

39.    Defendants EWC, WORLDPAY, WOY, and WOMACK, together with SMB and BMB, conspired among, assisted, encouraged, and/or enabled each other to employ a scheme to defraud Plaintiffs' of their interest in the Settlement Funds in order to facilitate future EWC investments in violation of the WOY SEC Injunction.

Exhibit A-1

40.     EWC, WORLDPAY, WOY, and WOMACK, together with SMB and BMB, conspired among, assisted, encouraged, and/or enabled each other to convert the Settlement Funds by transferring the Settlement Funds from MP2's bank account to EWC without any express written contract with MP2, including for merchant service processing or remittances to a third-party.

41.     Prior to, and to a greater extent because of, the Transfers, MP2 was rendered insolvent and also unable to pay its debts as they became due.  CURTIS, CRH, and MP2 also received no value in exchange for the Transfers, much less anything close to reasonably equivalent value for the Transfers.

42.     Because of the Transfers to EWC, MP2 defaulted on its debt obligations, including those it owed to CURTIS.  Because of MP2's failure to cure those defaults caused by mismanagement, fraud and theft by EWC, WORLDPAY, WOY, BRMG, BMB, and SMB, on April 28, 2014, at approximately 2:00 p.m. Central Time, CURTIS was forced to foreclose upon all collateral included within the Security Agreement, including, without limitation, the Settlement Funds. The remaining collateral, after all the Settlement Funds and cash from the business had gone missing through the deceitful acts of Defendants, was far from sufficient to repay the secured obligations to CURTIS.

43.     At all times while WORLDPAY was illicitly diverting MP2's credit card revenue to EWC, with the assistance of BMB, SMB, WOY and WOMACK, and as a result therefrom, MP2's creditors went unpaid, including but not limited to the Internal Revenue Service, the State Comptroller and its landlord.

44.     CURTIS was harmed by EWC's and WORLDPAY's receipt of the Settlement Funds and has suffered damages as a result of the Transfers to EWC and WORLDPAY.

Exhibit A-1

45.    CRH was harmed by EWC's and WORLDPAY's receipt of the Settlement Funds and has suffered damages as a result of the Transfers to EWC and WORLDPAY, including, but not limited to, lost profits caused by EWC's and WORLDPAY's destruction of MP2's business through its theft of the Settlement Funds.

## V.    CONDITIONS PRECEDENT

46.    All conditions precedent to Plaintiffs bringing their claims against Defendants have occurred and/or accrued, or the occurrence and/or accrual of any condition precedent is excused.

## VI.    CAUSES OF ACTION

**Count 1:Civil RICO: Use of Income Derived from a Pattern of Racketeering Activity to Invest in the Acquisition, Establishment and/or Maintenance of an Enterprise Affecting Interstate Commerce(18 U.S.C. §§ 1961(5) and 1962(a)):**

47.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 46 by reference as if fully set forth herein.

48.    Section 1962(a) of Title 18 maintains that "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

49.    Section 1961(1) of Title 18 defines "racketeering activity" as including "any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1029 (relating to fraud and related activity in connection with access devices), section 1344 (relating to financial institution fraud) ... (D) any offense involving fraud connected with a

Exhibit A-1

case under title 11 (except a case under section 157 of this title), fraud in the sale of securities …." 18 U.S.C. § 1961(1).

50.    At various times and places partially enumerated above, all Defendants used income derived from a pattern of racketeering activity to invest, directly or indirectly, part of such income, in the acquisition of an interest in, or the establishment or operation of, an enterprise affecting interstate or foreign commerce.

**Predicate Acts**

*Fraud Related to Access Device*

51.    "[W]hoever … knowingly and with intent to defraud effects transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000 … shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section." 18 U.S.C. § 1029(a)(5).

52.    Section 1029(e)(1) defines "access device" as any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds … ." 18 U.S.C. § 1029(e)(1).

53.    The statute describes "unauthorized access device" as any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." 18 U.S.C. § 1029(e)(3).

Exhibit A-1

54. "A merchant account number is a means of account access." *United States v. Dabbs*, 134 F.3d 1071, 1080 (11th Cir. 1998). Defendant's use of the merchant account number, where the fraudulently processed credit card funds would deposit, was use of an unauthorized access device because it provided Defendant with almost immediate access to those funds. *See id.* For the 11th Circuit, it was "readily apparent ... that such account numbers fall within this inclusive definition of access devices." *Id.*

55. Under the control and direction of WOY, WOMACK and EWC directed and conspired with BRMG, under the control and direction of BMB and SMB, and WORLDPAY to use MP2's FEIN to obtain a new Merchant Account with the intent and for the purpose of defrauding CURTIS and CRH.

### *Fraud Relating to Financial Institution*

56. "Whoever knowingly executes, or attempts to execute, a scheme or artifice ... to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises ... " commits Fraud Related to a Financial Institution. 18 U.S.C. § 1344(2).

57. In a 5th Circuit case, the Court determined an employee's false representation to the bank she had her employer's authority to affect several wire transfers to her personal account was Fraud Related to a Financial Institution. *United States v. Briggs*, 939 F.2d 222, 225 (5th Cir. 1991).

58. Under the control and direction of WOY, WOMACK and EWC directed and conspired with BRMG, under the control and direction of BMB and SMB, and WORLDPAY to use MP2's FEIN to open bank accounts for the purpose of receiving diverted funds in

Exhibit A-1

furtherance of a scheme to defraud CURTIS and CRH. The Defendants also used non-MP2 bank accounts to disguise the fact that WORLDPAY was diverting funds from MP2's credit card sales to EWC.

59.    As a result of the RICO violations stated in the foregoing, and pursuant to 18 U.S.C. §1964, Plaintiffs CURTIS and CRH are entitled to recover threefold the actual damages of not less than $267,000.00 related to the Settlement Funds transferred from MP2 to EWC and lost profits in an amount not less than $1,000,000.00 owed to CRH; pre and post-judgment interest as allowed by law; reasonable and necessary attorneys' fees; and costs of suit.

**Count 2:**
**Civil RICO: Conduct and Participation in the Affairs of an Enterprise through a Pattern of Racketeering Activity (18 U.S.C. §§ 1961(5) and 1962(c)):**

60.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 59 by reference as if fully set forth herein.

61.    When taken as a whole, the Predicate Acts alleged above constitute a pattern of racketeering activity, undertaken by Defendants, in furtherance of an Enterprise engaged in the sale of unregistered securities.

62.    Under the 1934 Securities Exchange Act, "[t]he term 'security' to mean any note." 15 U.S.C. § 78c(a)(10).

63.    The Supreme Court uses a four-factor test to determine whether a note is a security. The factors are (i) the "motivations that would prompt a reasonable seller and buyer to enter into" the transaction; (ii) the "plan of distribution" of the instrument; (iii) the "reasonable expectations of the investing public"; and (iv) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument." *Reves v. Ernst & Young*, 494 U.S. 56, 66-67 (1990).

Exhibit A-1

64.    Failure to satisfy one of the factors is not dispositive; they are considered as a whole. *See, e.g., McNabb v. S.E.C.*, 298 F.3d 1126, 1132–33 (9th Cir. 2002) (holding that, although the third factor supported neither side's position, the notes in question nevertheless constituted securities).

65.    In *S.E.C. v. Wallenbrock*, the 9th Circuit Court made a distinction between the use of the proceeds from the sale of notes for a consumer or commercial purpose and the use of the proceeds from the sale of notes to facilitate the reinvestment in the purchase of risky accounts receivables. *See S.E.C. v. Wallenbrock*, 313 F.3d 532, 536-38 (9th Cir. 2002)(analyzing the first Reves Factor).

66.    Upon information and belief, WOMACK and EWC, under the control and assistance of WOY, are using the funds generated by investors in the Participation Agreements to further invest in future credit card sales agreements.

67.    The second Reves Factor will indicate an instrument is a security if it is widely marketed and distributed. *See Reves*, 494 U.S. at 66-67. In Wallenbrock, although Defendant did not engage in a widespread marketing scheme, Defendant's willingness to sell to any member of the general public who would make the investment and provide his name, address, and social security number; and that the notes were held by over 1,000 investors in at least twenty-five states strongly indicated the notes were securities subject to regulation. *Wallenbrock*, 313 F.3d at 539.

68.    Upon information and belief, WOMACK and EWC, under the control and assistance of WOY, offered the securitized Participation Agreements to investors.

69.    The third factor, the "reasonable expectations of the investing public" depends on the promised rate of return, perceived risk, and duration of investment. A note with a yield much

Exhibit A-1

higher than prevailing interest rates, while also perceived as low risk and long-term, is a security. *Id.*

70.    Under information and belief, WOMACK and EWC, under the control and assistance of WOY, offered the securitized Participation Agreements promising rates-of-return far in excess of prevailing interest rates.

71.    The fourth factor, whether or not there is already a sufficient regulatory regime in place protecting the investing public, making SEC regulation unneeded.  To satisfy this, the 9th Circuit Court says the notes either should be collateralized by significant durable assets or a market of competing investment vehicles should exist; accordingly, accounts receivable are too volatile to satisfy this requirement.

72.    There is no other regulatory regime monitoring the behavior of WOY, WOMACK, and/or EWC.

73.    Analyzing the language of the Future Receivables Agreement under the parameters set forth in *Reves*, it is clear that WOMACK and EWC, under the control and direction of WOY, is engaged in the unregistered sale of securities.

74.    WOY's participation in this enterprise violates the SEC Permanent Injunction enjoining such conduct. *See* Exhibit 2.

75.    As a result of the RICO violations stated in the foregoing, and pursuant to 18 U.S.C. §1964, Plaintiffs CURTIS and CRH are entitled to recover threefold the actual damages of not less than $267,000.00 related to the Settlement Funds transferred from MP2 to EWC and lost profits in an amount not less than $1,000,000.00 owed to CRH; pre and post-judgment interest as allowed by law; reasonable and necessary attorneys' fees; and costs of suit.

Exhibit A-1

**Count 3: Contempt of Court for the Aiding and Abetting of WOY's Violation of Restraining Order**

76.      Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 75 by reference as if fully set forth herein.

77.      At the direction of WOY, each defendant is a co-conspirator and has aided and abetted WOY in the violation of the SEC Permanent Injunction enjoining his violation of Securities Laws. *See* Exhibit 2.

**Count 4: Conversion**

78.      Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 77 by reference as if fully set forth herein.

79.      CURTIS had property interests in the Settlement Funds and was entitled to possession of same.

80.      Defendants unlawfully and without authorization from CURTIS, assumed and exercised dominion and control over the Settlement Funds via the Transfers, to the exclusion of, or inconsistent with, CURTIS's ownership rights.

81.      CURTIS has demanded return of the Transfers and Defendants have refused to return them.

82.      As a result of Defendants' conversion of CURTIS's property, CURTIS has been damaged in an amount not less than $267,000.00.

**Count 5: Violation of Texas Theft Liability Act**

83.      Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 82 by reference as if fully set forth herein.

84.      Defendants unlawfully appropriated CURTIS's property with intent to deprive CURTIS of her property without CURTIS's consent, in violation of Texas Penal Code § 31.03.

Exhibit A-1

85.    As a result of Defendants' theft of CURTIS's property, CURTIS has been damaged in an amount not less than $267,000.00.

**Count 6:  Avoidance and Recovery of Fraudulent Transfer**

86.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 85 by reference as if fully set forth herein.

**Tex. Bus. & Comm. Code § 24.005(a)**

87.    At all relevant time periods before or after the Transfers were made, MP2 had one or more creditors, including CURTIS.

88.    MP2 made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers.

89.    At all relevant time periods before or after the Transfers were made, MP2 was engaged in or was about to engage in a business or transaction for which the remaining assets of MP2 were unreasonably small in relation to the business or transaction.

90.    At all relevant time periods before or after the Transfers were made, MP2 intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

91.    EWC was either the first transferee of the Transfers and the entity for whose benefit the Transfers were made, or the subsequent transferee of the Transfers other than a good faith transferee who took for value or from any subsequent transferee.

92.    CURTIS has been harmed by the fraudulent Transfers, and has suffered both monetary and non-monetary/equitable damages as a result.    CURTIS seeks to avoid the Transfers, recover the full value from EWC of the Transfers made, and obtain such other relief as

requested herein. Specifically, but without limitation, CURTIS seeks to avoid the full amount of the Transfers, plus interest, costs, and attorneys' fees.

**Tex. Bus. & Comm. Code § 24.006(a)**

93.     At all relevant time periods before the Transfers were made, MP2 had one or more creditors, including CURTIS.

94.     MP2 made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers.

95.     At all relevant time periods in which the Transfers were made, MP2 was insolvent, or became insolvent as a result of the Transfers.

96.     EWC was the first transferee of the Transfers and the entity for whose benefit the Transfers were made, or the subsequent transferee of the Transfers other than a good faith transferee who took for value or from any subsequent transferee.

97.     CURTIS has been harmed by the fraudulent Transfers, and has suffered both monetary and non-monetary/equitable damages as a result. CURTIS seeks to avoid the Transfers, recover the full value of the Transfers made, and obtain such other relief as requested herein. Specifically, but without limitation, CURTIS seeks to avoid and recover the full amount of the Transfers, plus interest, costs, and attorneys' fees.

**Count 7:  Unjust Enrichment**

98.     Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 97 by reference as if fully set forth herein.

99.     EWC wrongfully secured a benefit through the Transfers and it would be unconscionable to allow EWC to retain the Transfers or their value.

Exhibit A-1

100.    As a result of EWC's unjust enrichment from the taking of CURTIS's property, CURTIS and CRH have been damaged in an amount not less than $267,000.00.

**Count 8:  Negligence and Gross Negligence**

101.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 100 by reference as if fully set forth herein.

102.    As a credit card payment processing company, WORLDPAY owes a duty to not process credit card proceeds without contractual authority and to not pay settlement funds to third parties, such as EWC and/or to pay EWC the Settlement Funds from MP2's bank accounts, as it did.

103.    WORLDPAY breached this duty by and through MP2 when WORLDPAY allowed payments of the Settlement Funds to be paid directly to EWC or from MP2's bank accounts to EWC.

104.    WORLDPAY's breach of its duty, by and through MP2, WORLDPAY proximately caused CURTIS loss of not less than $267,000.00 of payments that WORLDPAY diverted to EWC, and CRH's to lose profits from MP2.

105.    WORLDPAY and EWC had actual, subjective awareness of the harm that would be caused by their unlawful transfer of the Settlement Funds in violation of CURTIS's rights as a secured creditor of the Settlement Funds and to CRH's rights to the Settlement Funds as an owner of MP2, but proceeded with the Transfers of the Settlement Funds with conscious indifference to CURTIS's and/or CRH's rights.

**Count 9:  Money Had and Received**

106.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 105 by reference as if fully set forth herein.

· Exhibit A-1

107.    EWC holds money that in equity and good conscious belongs to CURTIS and/or CRH.

108.    CURTIS and CRH are entitled to actual damages against EWC and WORLDPAY for the money they obtained from MP2 through the unlawful Transfer of the Settlement Funds.

109.    Because EWC and WORLDPAY acted with malice in the Transfer of the Settlement Funds, CURTIS and EWC are entitled to exemplary damages.

**Count 10: Conspiracy**

110.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 109 by reference as if fully set forth herein.

111.    EWC and WORLDPAY combined their efforts to cause payments to be remitted to EWC from MP2's bank accounts without proper authorization and/or documentation and in violation of CURTIS's rights as a secured creditor against MP2's accounts and cash proceeds and CRH's rights to the Settlement Funds by and through MP2.

112.    As a result of WORLDPAY's conspiracy with EWC to divert funds belonging to CURTIS and/or CRH to EWC, WORLDPAY is jointly and severally liable with EWC for conversion, violation of the Texas Theft Liability Act, unjust enrichment, violation of the Texas Fraudulent Transfer Act, and money had & received.

113.    As a result of WORLDPAY's conspiracy with EWC, CURTIS has been damaged in amount not less than $267,000.00.

114.    As a result of WORLDPAY's conspiracy with EWC, CRH has been damaged in amount not less than $1,000,000.00.

Exhibit A-1

**Count 11:  Assisting or Encouraging**

115.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 114 by reference as if fully set forth herein.

116.    EWC and WORLDPAY diverted funds from MP2 in violation of the Texas Theft Liability Act; the Texas Fraudulent Transfer Act; constituting conversion of funds that CURTIS had a lien against and CRH had an ownership interest in via MP2, causing EWC to be unjustly enriched and to hold money that in equity and good conscious belongs to CURTIS and/or CRH.

117.    EWC and WORLDPAY diverted funds from MP2 in violation of the Texas Theft Liability Act; the Texas Fraudulent Transfer Act; constituting conversion of funds CRH had an ownership interest in and causing EWC to be unjustly enriched.

118.    WOLRDPAY knew that the processing and diversion of funds from MP2's credit card receipts without proper authorization and/or consent constituted a tort, and therefore, acted with malice towards CURTIS's and/or CRH's rights to the Settlement Funds.

119.    WORLDPAY assisted and intended to assist EWC in obtaining payments from accounts belonging to MP2 despite CURTIS's lien against the funds and despite CRH's ownership interest in the Settlement Funds via MP2.

120.    WORLDPAY's assistance and encouragement to EWC was a substantial factor in enabling EWC to convert, unlawfully appropriate, and/or steal funds comprising the Settlement Funds of MP2's business in direct violation of CURTIS's rights as a lien-holder against the Settlement Funds and CRH's rights as an owner of MP2.

**Count 12:  Assisting & Participating**

121.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 120 by reference as if fully set forth herein.

Exhibit A-1

122.    EWC's and WORLDPAY's unauthorized diversion of MP2's funds to pay EWC was a conversion, unlawful appropriation and/or theft of the Settlement Funds upon which CURTIS had a lien and in which CRH had an ownership interest, and caused EWC to hold money that in equity and good conscious belongs to CURTIS and/or CRH.

123.    WORLDPAY caused remittances from to be paid to EWC without having a contract with MP2 or other type of proper authority, much less CURTIS's consent to such Transfers.

124.    WORLDPAY's own conduct, separate and apart from EWC's conduct, is a breach of WORLDPAY's duty to CURTIS and to CRH as an owner of MP2.

125.    WORLDPAY's participation in EWC's conversion, violation of the Texas Theft Liability Act, and violation of the Texas Fraudulent Transfer Act was a substantial factor in causing CURTIS to suffer damages and causing CRH to suffer damages.

**Count 13:  Attorney's Fees**

126.    Plaintiffs hereby incorporate the allegations contained in paragraphs 11 through 125 by reference as if fully set forth herein.

127.    CURTIS and CRH are entitled to recovery of reasonable attorney's fees for Defendants' violation of the Texas Theft Liability Act and/or the Texas Fraudulent Transfer Act, as well as for unjust enrichment. *See* Tex. Civ. Prac. & Rem. Code §134.005(b); Tex. Bus. & Com. Code §24.013; and Olivares v. Porter Poultry & Egg Co., 523 S.W.2d 726, 730-31 (Tex. App. – San Antonio 1975, no writ).

Exhibit A-1

## VII.    PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED Plaintiffs pray that the Court enter a judgment in favor of the Plaintiff and against Defendants as follows:

    i.    actual damages of not less than $267,000.00 related to the Settlement Funds;

    ii.    avoidance and recovery of no less than $267,000.00 in transfers from MP2 to EWC;

    iii.    attachment, levy, and/or other provisional remedy against EWC's and/or WORLDPAY's property and accounts;

    iv.    an injunction against further disposition of property or accounts by EWC and/or WORLDPAY;

    v.    lost profits in an amount not less than $1,000,000.00 owed to CRH;

    vi.    Pursuant to 18 U.S.C. §1964, threefold the actual damages of not less than $3,801,000.00;

    vii.    pre and post-judgment interest as allowed by law;

    viii.    reasonable and necessary attorneys' fees;

    ix.    costs of suit; and

    x.    all other relief, in law and equity, including all necessary writs to which Plaintiffs have shown themselves entitled, whether at law or in equity.

Exhibit A-1

Dated: April 3, 2015.

Respectfully submitted,

*Michael H. Myers*

Digitally signed by Michael H. Myers
DN: cn=Michael H. Myers, o=Curtis Castillo PC,
ou, email=mmyers@curtislaw.net, c=US
Date: 2015.04.03 14:15:21 -05'00'

Mark A. Castillo
State Bar No. 24027795
Michael H. Myers
State Bar No. 24032779
**CURTIS | CASTILLO PC**
901 Main Street, Suite 6515
Dallas, Texas 75202
Telephone: 214.752.2222
Facsimile: 214.752.0709
E-mail: mmyers@curtislaw.net

**COUNSEL FOR PLAINTIFFS STEPHANIE D.
CURTIS AND CURTIS RESTAURANT
HOLDINGS, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 3, 2015 a true and correct copy of the foregoing Petition was served via electronic case file manager and/or First Class U.S. mail upon Mr. Andrew Bergman of Andrew A. Bergman, P.C. at 4514 Travis Street, Suite 300, Dallas, Texas 75205; and Mr. Wesley C. McDowell of McDowell Law at 545 East John Carpenter Freeway, Suite 670, Irving, Texas 75062 in accordance with Rule 21 of the Texas Rules of Civil Procedure.

*Michael H. Myers*

Digitally signed by Michael H. Myers
DN: cn=Michael H. Myers, o=Curtis Castillo
PC, ou, email=mmyers@curtislaw.net, c=US
Date: 2015.04.03 14:15:54 -05'00'

Michael H. Myers

Exhibit A-1

**U.S. Securities and Exchange Commission**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Litigation Release No. 16917 / February 28, 2001

*SECURITIES AND EXCHANGE COMMISSION V. SMART-MART, INC., TIMOTHY A. MCMURRAY AND BRADLEY D. WOY* Civil Action No. 3:01-CV-0397 (BL) (N.D. Texas, Dallas Division)

The Securities and Exchange Commission filed a civil action on February 28, 2001, against Smart-Mart, Inc., Timothy A. McMurray and Bradley D. Woy for an alleged fraudulent securities offering. The Complaint, filed in the United States District Court for the Northern District of Texas, alleges that from March 1998 through February 1999, Smart-Mart raised approximately $2.4 million from approximately 720 investors located nationwide and in Canada through the sale of common stock in a purported private placement offering.

In connection with these sales, Smart-Mart, McMurray and Woy knowingly made false and misleading statements to investors regarding an impending initial public offering ("IPO"), the business prospects of the company, the use of investor funds, and the liquidity and return on investment. In addition, McMurray failed to disclose critical information regarding his background and experience. Notwithstanding these representations, Smart-Mart never took any significant steps to conduct an IPO and the company had minimal business operations. Moreover, Smart-Mart's financial and other business records reveal that McMurray and Woy used a large portion of investor funds for unauthorized business and personal expenses.

- Smart-Mart, Inc., a Texas corporation located in Dallas, Texas, was incorporated on September 22, 1997. Smart-Mart operated a multi-level marketing Internet retail shopping center, found at www.smartmart.com, which provided a 24-hour Internet retail directory providing sundry products and services to Smart-Mart members.

- Timothy A. McMurray, age 54 and a resident of Dallas, Texas, was a founder of Smart-Mart and was the president, CEO and chairman of the board until he resigned in October 1998. McMurray was convicted of bank fraud for a check-kiting scheme in January 1993, and was sentenced to five years probation.

- Bradley D. Woy, age 30 and a resident of Irving, Texas, was promoted to the president, CEO and chief operating officer of Smart-Mart following McMurray's resignation.

The Complaint charges the defendants with violating the securities registration and antifraud provisions of Sections 5(a), 5 (c) and 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The Commission seeks permanent

Exhibit 1

injunctive relief against Smart-Mart, McMurray and Woy, as well as disgorgement with prejudgment interest, an accounting and civil money penalties.

The Commission would like to acknowledge the assistance of the Texas State Securities Board.

This action is brought as part of the SEC's Fifth Internet Fraud Sweep. For tips on how to avoid Internet investment schemes, visit http://www.sec.gov/investor/pubs/cyberfraud.htm. For more information about Internet fraud, visit http://www.sec.gov/divisions/enforce/internetenforce.htm. To report suspicious activity involving possible Internet fraud, visit http://www.sec.gov/complaint.shtml. For a description of other SEC enforcement actions involved in this Internet Fraud Sweep, visit http://www.sec.gov/news/press.shtml.

*http://www.sec.gov/litigation/litreleases/lr16917.htm*

---

Home | Previous Page                                    Modified:02/21/2001

Exhibit A-1



Home | Previous Page

**U.S. Securities and Exchange Commission**

## U.S. SECURITIES AND EXCHANGE COMMISSION

### LITIGATION RELEASE NO. 18342 / September 11, 2003

***UNITED STATES v. TIMOTHY A. McMURRAY, BRADLEY D. WOY, ET AL.***
**No. 3:03-CR-0270-N, USDC, NDTX (Dallas Division)**

***SECURITIES AND EXCHANGE COMMISSION V. SMART-MART, INC., TIMOTHY A. McMURRAY AND BRADLEY D. WOY*, No. 01-CV-0392-M, USDC, NDTX (Dallas Division)**

Timothy A. McMurray and Bradley D. Woy, former officers of defunct Smart-Mart, Inc., were indicted on July 23, 2003 by a federal grand jury for securities fraud and related offenses in connection with their operation of the Dallas-based company. The defendants' conduct was the subject of a successful enforcement action brought by the Securities and Exhange Commission in 2001.

The 49-count indictment, obtained by the United States Attorney for the Northern District of Texas (Dallas Division), alleges that McMurray, Woy and three additional defendants fraudulently raised approximately $2.4 million from more than 700 investors by soliciting them to invest money and purchase stock in the Internet-based retailer company, falsely representing that the funds would be used for company operations and business development.

As a result of its lawsuit, the Commission, in October 2002, succeeded in obtaining permanent injunctions against McMurray, Woy and Smart-Mart, which enjoin each defendant from future violations of Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Further, McMurray was ordered to pay disgorgement and prejudgment interest of $261,438 and barred from serving as an officer or director of a public company, and Woy was ordered to pay disgorgement of $25,000.

The Commission's civil action alleged that from March 1998 through February 1999, Smart-Mart raised approximately $2.4 million from approximately 720 investors located nationwide and in Canada through the sale of common stock, and that Smart-Mart, McMurray and Woy made false and misleading statements to investors regarding an impending initial public offering ("IPO"), the business prospects of the company, the use of investor funds, and the liquidity and return on investment. Moreover, the Commission charged that Smart-Mart never took any significant steps to conduct an IPO and, in fact, had minimal business operations. Additionally, the Commission alleged that McMurray and Woy used a large portion of investor funds for unauthorized business and personal expenses.

Exhibit 2

*http://www.sec.gov/litigation/litreleases/lr18342.htm*

Exhibit A-1

Modified: 09/11/2003

Exhibit A-1

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

%AO 245B   (Rev 12/03) Judgment in a Criminal Case
Sheet 1   TXND Mod - 09/28/04

# UNITED STATES DISTRICT COURT

**Northern**   District of   **Texas - Dallas Division**

NOV 1 0 2005

CLERK, U.S. DISTRICT COURT
By _____
      Deputy

UNITED STATES OF AMERICA

**V.**

**BRADLEY D. WOY**

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **3:03-CR-270-N (02)**

USM Number: **30875-177**

**William M. Ravkind**
Defendant's Attorney

## THE DEFENDANT:

[ ]  pleaded guilty to count(s)

[✓]  pleaded guilty to count(s) before a U.S.   **Count 3 of the Second Superseding Indictment filed July 20, 2004**
Magistrate Judge, which was accepted
by the court.

[ ]  pleaded nolo contendere to count(s)
which was accepted by the court.

[ ]  was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 USC §§ 77q(a) & 77x | Securities Fraud | July 1999 | 3 |

The defendant is sentenced as provided in pages 2 through 6 and attachments of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]  The defendant has been found not guilty on count(s)

[✓]  **Count(s) remaining of the Original, First and Second Indictments** _____   [ ] is  [✓] are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**NOVEMBER 3, 2005**
Date of Imposition of Judgment

_____
Signature of Judge

**U. S. DISTRICT JUDGE**
**DAVID C. GODBEY**
Name and Title of Judge

11/10/05
Date

Exhibit 3

Exhibit A-1

AO 245B    (Rev. 12/03) Judgment in Criminal Case
          Sheet 2 — Imprisonment   TXND Mod - 9/28/04

Judgment — Page ___2___ of ___6___

DEFENDANT: **BRADLEY D. WOY**
CASE NUMBER:**3:03-CR-270-N (02)**

## IMPRISONMENT

Pursuant to the Sentencing Reform Act of 1984, but taking the Guidelines as advisory pursuant to United States v. Booker, and considering the factors set forth in 18 U.S.C. Section 3553(a), the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**32 (Thirty-Two) Months on Count 3**

[✓] The court makes the following recommendations to the Bureau of Prisons:
    **That the defendant be designated to a facility near the Dallas/Fort Worth area if possible.**

[ ] The defendant is remanded to the custody of the United States Marshal.

[ ] The defendant shall surrender to the United States Marshal for this district:

    [ ] at _____ [ ] a.m. [ ] p.m. on _____ .

    [ ] as notified by the United States Marshal.

[✓] The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    [✓] before **10:00 a.m.** on    **Monday, February 20, 2006**

    [ ] as notified by the United States Marshal.

    [ ] as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on                                           to

a                                  , with a certified copy of this judgment.

UNITED STATES MARSHAL

By

DEPUTY UNITED STATES MARSHAL

Exhibit A-1

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___6___

DEFENDANT: **BRADLEY D. WOY**
CASE NUMBER: **3:03-CR-270-N (02)**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : **2 (Two) Years on Count 3**

 

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Exhibit A-1

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
Sheet 3C — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT: **BRADLEY D. WOY**
CASE NUMBER: **3:03-CR-270-N (02)**

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall refrain from incurring new credit charges or opening additional lines of credit without approval of the probation officer unless the probation officer makes a determination that the defendant is in compliance with the payment schedule.

The defendant shall provide to the U.S. Probation Officer any requested financial information.

The defendant shall not enter into any self-employment while under supervision without prior approval of the U.S. Probation Officer.

The defendant shall pay restitution in the amount of $789,000, payable to the U. S. District Clerk, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242, for disbursement to:

"See Attached list"

A portion of this, in the amount of $252,300 is joint and several with co-defendant Timothy McMurray (01). If upon commencement of the term of supervised release any part of the restitution remains unpaid, the defendant shall make payments on such unpaid balance beginning 60 days after release from custody at the rate of at least $300 per month until the restitution is paid in full. Further, it is ordered that interest on the unpaid balance is waived pursuant to 18 USC § 3612(f)(3).

Exhibit A-1

AO 245B     (Rev 12/03) Judgment in a Criminal Case
          Sheet 5 — Criminal Monetary Penalties    TXND Mod 2 - 09/28/04

|  | Judgment — Page | 5 | of | 6 |
|---|---|---|---|---|

DEFENDANT: **BRADLEY D. WOY**
CASE NUMBER: **3:03-CR-270-N (02)**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 789,000 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☑ The defendant must make restitution (including community restitution), payable to the U.S. District Clerk to be disbursed to the following payee(s) in the amount(s) listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|
| See Attached List | | |

| | | |
|---|---|---|
| **TOTALS** | $ 789,000 | |

☐ Restitution amount ordered pursuant to plea agreement $ 

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☑ the interest requirement is waived for the   ☐ fine   ☑ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

Exhibit A-1

AO 245B    (Rev  12/03) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments    TXND Mod 1 - 09/28/04

Judgment — Page __6__ of __6__

DEFENDANT: **BRADLEY D. WOY**
CASE NUMBER: **3:03-CR-270-N (02)**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A  ☐  Lump sum payment of $ _____ due immediately, balance due

       ☐  not later than _____ , or
       ☐  in accordance ☐ C, ☐ D, ☐ E, or ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
           _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☑  Payment in equal **Monthly** (e.g., weekly, monthly, quarterly) installments of $ **300** over a period of
       **N/A** (e.g., months or years), to commence **60** (e.g., 30 or 60 days) after release from imprisonment to a
       term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
       imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:
       **It is ordered that the defendant shall pay to the United States a special assessment of $100, for Count 3, which shall be
       due immediately.  Said special assessment shall be made to the Clerk, U. S. District Court.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the U.S. District Clerk, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑  Joint and Several

       Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
       and corresponding payee, if appropriate.
       **Joint and Several with co-defendant Timothy McMurray (01) in the amount of $252,300 in criminal action number
       3:03-CR-270-N**

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States: See Sheet 6B.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Exhibit A-1

# CRIMINAL MONETARY PENALTIES-ATTACHMENT

Bradley D. Woy
3:03-CR-270-N(02)
Restitution Amount: **$789,000**
Jointly and severally with Co-Defendant Tim A. McMurray (01)
in the Amount of **$252,300.**

Mr. Arthur Alamanza
$100
Smart-Mart

Ms. Kathleen Alvarado
$100
Smart-Mart

Ancient Formulas, Inc.
$500
Smart-Mart

Ms. Adlee Anderson
$500
Smart-Mart

Ms. Karen L. Anderson
$2,000
Smart-Mart

Benjamin Companies
$2,500
Smart-Mart

Ms. Laura Bibeau
$1,000
Smart-Mart

Ms. Jorita B. Billups
$1,000
Smart-Mart

Ms. Ellen Sue Blevins
$1,500
Smart-Mart

Mr. Marvin E. Blevins
$1,000
Smart-Mart

Judy and Richard Bouyear
$1,000
Smart-Mart

Ms. Karen Brennan
$3,000
Smart-Mart

Jim and Carolyn Brewster
$32,000
Smart-Mart

Mr. Leonardo D. Brown
$1,000
Smart-Mart

Leroy or Rosemary Burgess
$1,000
Smart-Mart

C.B. Communications
$8,000
Smart-Mart

Page 1 of 12

Exhibit A-1

Mr. Paul Christensen
$14,500
Smart-Mart

Mr. Robert M. Christiason
$1,900
Smart-Mart

Ms. Carolyn Christie
$200
Smart-Mart

Mr. Lee M. Clemons
$6,000
Smart-Mart

Mr. Teddie W. Cline
$2,000
Smart-Mart

Mr. Michael S. Conley
$2,500
Smart-Mart

Mr. Kenneth Davis
$1,000
Smart-Mart

Mr. David Devore
$200
Smart-Mart

Mr. Jerry Devore
$9,000
Smart-Mart

Ms. Emma S. Dicken
$1,000
Smart-Mart

Ms. Bobbie Kay Dixon
$400
Smart-Mart

Mr. Steven E. Dondelinger
$1,500
Smart-Mart

Canelli E. Drew
$200
Smart-Mart

Ms. Michelle Duvall
$500
Smart-Mart

Mr. Franklin W. English
$1,000
Smart-Mart

Ms. Mary L. Eskew
$1,000
Smart-Mart

Ms. Brenda G. Farris
$1,000
Smart-Mart

Ms. Peggy N. Faulkner
$300
Smart-Mart

Robert and Nancy Fink
$1,000
Smart-Mart

Mr. Michael Flores
$100
Smart-Mart

Page 2 of 12

Exhibit A-1

Jason and Robin Ford
$300
Smart-Mart

Ms. Debra Foster
$300
Smart-Mart

Mr. Jason D. Foster
$300
Smart-Mart

J.A. Gabriel Enterprises
$3,000
Smart-Mart

Mr. Estevan M. Garcia
$3,100
Smart-Mart

Ms. Kim Garrison
$1,300
Smart-Mart

Mr. Philip Gilbert
$800
Smart-Mart

Ms. Susan Gilbert
$2,500
Smart-Mart

Mr. Eduardo Gomez
$1,100
Smart-Mart

Mr. Francisco G. Gonzalez
$151,500
Smart-Mart

Mr. Robert Grove
$500
Smart-Mart

Mr. Jon M. Gurett
$3,000
Smart-Mart

Mr. Christopher Guerre
$2,000
Smart-Mart

Ms. Reda Hall
$500
Smart-Mart

Mr. Dan Hamilton
$10,000
Smart-Mart

Hamer Concepts
$1,500
Smart-Mart

Mr. Danny Haney
$200
Smart-Mart

Mr. Clayton L. Hansen
$2,000
Smart-Mart

Mr. Nils Hansen
$2,000
Smart-Mart

Mr. Brandon S. Harris
$2,000
Smart-Mart

Exhibit A-1

Brad or Jana Helmer
$500
Smart-Mart

Mr. Antonio Hendricks
$1,000
Smart-Mart

Ms. Sandra L. Hicks
$2,000
Smart-Mart

Ms. Belinda Hodges
$200
Smart-Mart

Ms. Roberta F. Holmes
$2,000
Smart-Mart

Mr. Al House
$16,800
Smart-Mart

Mr. Dale Hovey
$2,000
Smart-Mart

Mr. Eric Holt/Eric Hoyle
$150
Smart-Mart

Ms. Norma Hunt
$500
Smart-Mart

Mr. George F. King
$100
Smart-Mart

Ms. Joyce Kinman
$10,000
Smart-Mart

Ms. Sandra Knickerbocker
$300
Smart-Mart

Ms. Eva E. Lentz
$100
Smart-Mart

B.D. Lockler
$200
Smart-Mart

Ms. Rhoda Battles Low
$200
Smart-Mart

Ms. Maria Lozano
$100
Smart-Mart

Mr. Clint Lyle
$100
Smart-Mart

Mr. Randall Lyle
$500
Smart-Mart

Mr. Charles W. Mapp
$1,000
Smart-Mart

Ms. Karen M. Martin
$2,500
Smart-Mart

Page 4 of 12

Exhibit A-1

Ms. Tammy Maynard
$500
Smart-Mart

Ms. Sherri McCollum
$1,500
Smart-Mart

Ms. Sherri Reed McCormick
$2,000
Smart-Mart

Ms. Shirley McCracken
$100
Smart-Mart

Mr. Robert McLean
$200
Smart-Mart

Ms. Claudia A. McMurdock
$4,000
Smart-Mart

Mr. Michael McWhorter
$3,500
Smart-Mart

Ms. L. Joy Mentzel
$4,500
Smart-Mart

Ms. Carol O. Mitchell
$5,000
Smart-Mart

Ms. Shirley A. Mobbs
$1,500
Smart-Mart

Ms. Kathy Moga
$500
Smart-Mart

Ms. Barbara Montgomery
$100
Smart-Mart

Mr. Raymond Neff
$500
Smart-Mart

Ms. Nancy Newell
$100
Smart-Mart

Mr. Anthony Noe
$1,000
Smart-Mart

Ms. Mildred LaJean Norris
$300
Smart-Mart

E. Lala Norwood
$100
Smart-Mart

Owltech Network Consulting
$2,000
Smart-Mart

Ms. Rebekah C. Panetta
$100
Smart-Mart

Ms. Dayna Patrick
$2,000
Smart-Mart

Page 5 of 12

Exhibit A-1

Cindy and Michael Peden
$400
Smart-Mart

Mr. Ralph Pedersen
$2,000
Smart-Mart

Ms. Irene M. Peters
$150
Smart-Mart

Mr. Robert P. Piearcy
$200
Smart-Mart

Kenneth and Carol Prince
$1,000
Smart-Mart

Ms. Donna Prince
$2,000
Smart-Mart

Shelonda and Mark Prince
$1,000
Smart-Mart

Rudolph and Eloise Prioleau
$1,000
Smart-Mart

Mr. Yshmael A. Raheem
$3,000
Smart-Mart

Mr. Oscar Rasmussen
$1,000
Smart-Mart

Mr. Richard Ray
$1,000
Smart-Mart

Mr. Virgil Reich
$6,000
Smart-Mart

Ms. Kim Ridenour
$200
Smart-Mart

T.K. Robinette
$1,000
Smart-Mart

Mr. Nicholas Rodriguez
$3,000
Smart-Mart

Ms. Miranda Saddler Seale
$500
Smart-Mart

Ms. Mary Ann Sadler
$500
Smart-Mart

Mr. Mark I. Sampson
$1,000
Smart-Mart

Mr. Mel R. Sampson
$7,500
Smart-Mart

Ms. Melissa K. Sampson
$1,000
Smart-Mart

Exhibit A-1

Ms. Glenda Sandridge
$300
Smart-Mart

Carlos and Pamela Santiago
$3,000
Smart-Mart

Mr. Kurt Sermas
$100
Smart-Mart

Mr. Paul V. Sermas
$1,000
Smart-Mart

Mr. Donald J. Sheller
$20,000
Smart-Mart

Mr. William A. Sizer
$3,000
Smart-Mart

Ms. Laurie L. Smith
$3,000
Smart-Mart

Ms. Paulette Smith
$200
Smart-Mart

Mr. Ronald L. Smyres, Sr.
$3,000
Smart-Mart

Mr. Ronald L. Smyres, Jr.
$2,000
Smart-Mart

Mr. David Snell
$10,000
Smart-Mart

Mr. Frank Snider
$23,000
Smart-Mart

K.D. Snyder
$3,000
Smart-Mart

Mr. James M. Sprowls
$200
Smart-Mart

Mr. James Sullivan
$100
Smart-Mart

Mr. Robert Sullivan
$5,000
Smart-Mart

Mr. Robert Tate
$800
Smart-Mart

Mr. John C. Tay
$6,000
Smart-Mart

Mr. Ronald W. Taylor
$1,900
Smart-Mart

Mr. Tomas Tellez
$4,500
Smart-Mart

Exhibit A-1

Vernia Thorn
$100
Smart-Mart

Ms. Betty Thorp
$1,000
Smart-Mart

Billie Kay Tompkins
$4,500
Smart-Mart

Mr. William G. Tompkins
$1,000
Smart-Mart

Mr. Jeffery Townsend
$3,000
Smart-Mart

Ms. Mary Alice Townsend
$2,000
Smart-Mart

Mr. Troy E. Trahan
$4,500
Smart-Mart

Mr. Christopher D. Treadwell
$20,000
Smart-Mart

Mr. Jerry W. Tropp
$2,000
Smart-Mart

Mr. Charles A. Tubb
$700
Smart-Mart

Ms. Dana L. Tubb
$500
Smart-Mart

Ms. Linda M. Tucker
$800
Smart-Mart

Mr. Dexter David Tuttle, Jr.
$20,000
Smart-Mart

Victory Seminars
$20,000
Smart-Mart

Ms. Dorcus Vigil
$100
Smart-Mart

Ms. Esperanza Villarreal
$5,000
Smart-Mart

Mr. John D. Wade
$400
Smart-Mart

Barbara and Robert Wells
$10,000
Smart-Mart

Mr. Barry H. Wells
$50,000
Smart-Mart

Mr. Brad T. Wells
$11,000
Smart-Mart

Page 8 of 12

Exhibit A-1

Mr. Chad White
$500
Smart-Mart

Marlys Whitley
$100
Smart-Mart

Ms. Donna F. Wilkinson
$600
Smart-Mart

Mr. Jeff P. Williams
$1,000
Smart-Mart

Bobbie Wilson
$1,200
Smart-Mart

Mr. Edward W. Wilson
$1,500
Smart-Mart

Mr. James M. Wilson
$100
Smart-Mart

Mr. Michael W. Wixom
$10,000
Smart-Mart

Mr. Robert L. Wrye
$5,000
Smart-Mart

Exhibit A-1

ADDITIONAL VICTIMS

Mr. Linwood Adams
$1,000
Smart-Mart

Mr. Michael Carter
$3,000
Smart-Mart

Ms. Louise Anita
$100
Smart-Mart

Ms. Beverly C. Clague
$500
Smart-Mart

Mr. David Barnes
$2,500
Smart-Mart

Mr. Randy Clark
$2,500
Smart-Mart

Mr. Craig Battles
$400
Smart-Mart

Corey and Associates Group
$8,500
Smart-Mart

Jorrick L. Battles
$2,000
Smart-Mart

Cornerstone Monuments
$500
Smart-Mart

Mr. Tom Becerra
$200
Smart-Mart

Ms. Nicole Cova
$50
Smart-Mart

Mr. J. Matthew Butler
$500
Smart-Mart

Ms. Jodie Crown
$100
Smart-Mart

Mr. Vince W. Callender
$5,000
Smart-Mart

Mr. Christopher Denman
$500
Smart-Mart

Mr. Ted Canipe
$500
Smart-Mart

Ms. Amy Devore
$200
Smart-Mart

Page 10 of 12

Exhibit A-1

Mr. Scott Donatelli
$200
Smart-Mart

Mr. Dennis Fitzgerald
$150
Smart-Mart

Mr. Charles Gathings
$200
Smart-Mart

Mr. Anthony Hankins
$300
Smart-Mart

Ms. Marjorie Hartford
$100
Smart-Mart

Mr. Colin Hartley
$8,500
Smart-Mart

Mr. William Holz
$1,000
Smart-Mart

Clioce D. Janson
$5,000
Smart-Mart

Mr. Barry V. Kimmel
$12,000
Smart-Mart

Ray or Weeda Lowry
$10,000
Smart-Mart

Mr. Stephen Luhrs
$6,500
Smart-Mart

Mr. Andrew Martinez
$500
Smart-Mart

Dwon Matthews
$3,400
Smart-Mart

Mr. Gary Newman
$1,600
Smart-Mart

Ms. Sabra Reich
$500
Smart-Mart

Mr. Ernest Rice, Jr.
$6,000
Smart-Mart

Mr. Peter Sluyter
$3,000
Smart-Mart

Mr. Dutch Stamey
$500
Smart-Mart

Mr. Johnny Thorn
$200
Smart-Mart

Mr. Jesse Townsend
$5,400
Smart-Mart

Page 11 of 12

Exhibit A-1

Drionne Tucker
$100
Smart-Mart

Martha/ V. Bellah Tyler
$3,500
Smart-Mart

Ms. Linda Vidaurri
$200
Smart-Mart

Ms. Betsy Whitaker
$2,000
Smart-Mart

Chris Wilfong
$10,500
Smart-Mart

Danny and Janie Wilfong
$15,000
Smart-Mart

Mr. James H. Wilson
$1,000
Smart-Mart

Mr. James T. Wilson
$1,500
Smart-Mart

Ms. Mandy Wilson
$100
Smart-Mart

Mr. Jeffrey Windham
$1,000
Smart-Mart

Mr. David Burns
$1,000
Smart-Mart

Mr. Dwane Wilson
$500
Smart-Mart

Exhibit A-1



Woy does "merchant cash advances." Power chef Stephan Pyles is a repeat customer. photography by Elizabeth Lavin

# Need $100 Grand by the End of the Week?

**Brad Woy has a proposition to get you some money fast.**                    Exhibit 4

BY JOSEPH GUINTO  |  FROM D MAGAZINE AUGUST 2011

Off the top of his head, Brad Woy can't recall the precise date on which he reported to the Federal Correctional Institution in Fort Worth to serve a 32-month sentence for securities fraud. "It was maybe March 23," he says. "Or the

29th. Either way, it was the end of March in 2006." His recollection is also fuzzy on the exact date he got out. "I think it was March 7, 2007, or something," Woy says. "It's hard to say. That was all so long ago."

And, yet, one date from around the same time springs immediately to mind for Woy: October 31, 2007. On that day, after having served his 11 months in prison, plus three months in a halfway house in Hutchins, and another three of home confinement for his role in what the SEC and Justice Department said was a scheme that defrauded 720 investors out of $2.4 million, Woy started a new business. Called Express Working Capital, the company was founded with a $50,000 investment from several of Woy's longtime friends, people who still trusted him. "The first guy I called grew up on the same street that I did in Irving," says Woy, a 40-year-old with a wide frame and a scruffy beard. "He didn't even blink. He just wrote me a check."

Four years later, that faith is being repaid. Express Working Capital is a rapidly growing company in a booming industry known as merchant cash advances. Ever since the housing bust hobbled traditional lenders, businesses that either can't get loans from banks, or that don't want to accept banks' strict collateral requirements, are turning to companies like Woy's to get capital. In return for the money, business owners have to give merchant cash advancers a cut of all their credit card sales. A huge cut. Sometimes up to 25 percent or more. That's a big enough bite to have drawn the scrutiny of regulators and prompted *Inc.* magazine to advise its readers not to use such services.

At first blush, then, it sounds like a stretch when Woy says his company does business in "a fair and equitable manner." Look at it this way: he is an ex-con who, since his release from federal prison, has been giving large amounts of cash to small-business owners, then requiring those business owners to pay him back in a short period of time at what are, effectively, high interest rates. That sounds a whole lot like a loan shark.

So why would some of Dallas' more celebrated restaurateurs do business with this guy? Julienning vegetables is hard to do with two broken thumbs.

Call Brad Woy an ex-con if you want, but Stephan Pyles has another name for him: "Godsend."

"After the economy crashed a couple years ago, our bank withdrew our credit line," says the chef-owner of the eponymous downtown restaurant. "We were using the credit line as working capital. But it was converted to a loan."

That meant Pyles suddenly had a new liability on his books at a time when the recession had put his upscale restaurant's revenues on the skids. "It was painful," he says. "We tried to go to other banks, and everyone who was receptive before to giving us a line of credit was suddenly telling us, 'Well, today is a different day.' "

Money is tight. Loans are hard to come by. That's one reason some of the biggest names in Dallas restaurants have turned to Woy's Express Working Capital. More than half of Woy's customers—a client base spread over 38 states—are bars and restaurants. A couple dozen are local. You probably know a lot of them. The Cedars Social, owned by Brian Williams, is a client. So, too, is Mi Piaci in North Dallas. As is Robert Colombo's La Reve Group, which owns Trece, Villa-O, and Sfuzzi.

Although restaurants have had a hard time finding traditional bank funding, they make a good fit for merchant cash advance firms. Because the one thing that even marginally successful restaurants have plenty of is credit card transactions. A big place might ring up hundreds of thousands of dollars of transactions in a month. This is where Woy's company and the 50 or so others like it in the country—including the industry's giant, Georgia-based AdvanceMe—come in. Merchant cash advancers don't loan money to businesses in a traditional sense. If they did, their interest rates would be subject to the same usury laws that banks must abide. Instead they purchase, at a discount, future credit card receivables from merchants. Then, after switching the merchant to a new credit card processor, they take a percentage of daily receipts until the account is settled.

A typical transaction might work like this: Woy buys $130,000 worth of future credit card receivables for $100,000, which he pays the merchant in a lump sum. Depending on the merchant's history of credit card sales, Woy takes 12 to 15 percent of the daily credit card transactions. Unlike a loan, this arrangement sets no maturity date and no fixed payment. If sales slump, the merchant pays less each month. If the working capital from Woy helps sales grow, the merchant pays more.

For the merchant, the cost of that capital is steep. If it takes, say, six months to pay off that $130,000, the effective annual rate of this "loan" is 60 percent. (Of course, if it takes two years to settle the account, that effective annual rate is only 15 percent.) The upside for the merchant is that they get cash fast—Woy did his first deal with Pyles in one

week—and he doesn't have to personally guarantee the transactions. No second mortgages, no putting up cars as collateral.

That upside is exactly what drew Mi Piaci owners Sonia and Brian Black, along with their partner, Dean McSherry, to Express Working Capital. After a recent inspirational trip to Italy, the Blacks wanted to overhaul the restaurant. "We could have renovated a little at a time out of cash flow," McSherry says. "But we decided to do it all at once with money from Brad." Today, the renovation is done, and the loan--er, credit card receivables purchase--has already been paid back.

Now Woy is exploring multiple deals with McSherry, who is CEO of Dallas-based Preferred Restaurant Management Group, a company that provides back-office functions to hundreds of restaurants nationwide and is partners with some of them. Back in the late '90s, when Woy was, himself, briefly a partner in a restaurant—Lakewood's now-defunct La Dolce Vita—McSherry and Woy played tennis every Saturday. As the years went on, they lost touch. But after Woy's prison term, they reconnected when Woy approached McSherry about getting Express Working Capital in front of his restaurant clients. Before any deals were struck, though, Woy told McSherry about his legal trouble.

"I still remember the day he told me about it," McSherry says. "He was very up front and told me he didn't want that to be a problem for any of my clients. I really admire him for that. Today, if there's going to be a deeper deal than just lending cash to my clients, he'll also tell them directly."

Here's what Woy tells them: five years after graduating from SMU in 1992, he had parlayed a stint overseeing two online fantasy stock trading games that he'd run with his father, a charismatic former sports agent named Bucky, into a job as a consultant with an upstart online retailer called SmartMart, which was run by a man named Timothy McMurray. Just months later, McMurray left the company—and left Woy as the CEO and owner. Truthfully, it was only barely a going concern. But Woy saw potential. "I attempted to take the company public," Woy says. "We were in negotiations with another company that wanted to buy SmartMart. But the Internet bubble started to break, and the deal fell apart." Some 720 investors who had pumped $2.4 million into SmartMart were left with nothing.

From the SEC's perspective, Woy and McMurray had committed fraud by misrepresenting SmartMart's potential and by misusing the cash collected. In 2002, Woy settled with the SEC, agreeing to relinquish his entire monetary gain from his time at SmartMart—$25,000. "That was it," he says. "That was all I made. There was no benefit to me. I never bought a house or anything like that with any of the money."

Still, one year later, while Woy was working as a strategy consultant with Accenture, the Justice Department obtained an indictment against him and McMurray—partly, Woy thinks, because McMurray had a past. McMurray had been convicted in a 1993 check-kiting scheme. "I was truthfully at a bad place, at a bad time, with a bad character," Woy says. He fought the case for two years before accepting a plea deal for a 32-month prison term and $814,000 in civil and criminal penalties. (McMurray got 30 months and a bigger fine than Woy's). "That was a really tough decision," Woy says. "If I went to trial and was found guilty, I was looking at 5 to 10 years of being away. I was married at that time. We had a baby on the way. And it came down to a life decision. What did I want to risk? So I pled guilty. It was a great lesson for me. It taught me you have to be very, very cautious with whomever you do business with. And you need to be very transparent about how you do business."

With that lesson learned and with a new business in mind, Woy turned to people he'd known his whole life. His neighborhood buddy. A fraternity brother he'd hired at one of his earliest jobs (a subprime auto financing company called the Brower Group). Longtime friend and indie record mogul John Kirtland, who runs Kirtland Records. His dad, Bucky. His brother, Jordan. With that group and investments from a few others, he stacked up the money he needed to advance to other businesses. He also got a substantial line of credit from Texas Capital Bank, a line that most of his restaurant clients can no longer access.

Woy's business is risky. He has almost no recourse if a merchant goes out of business and defaults on a cash advance. To minimize the risk, Woy works only with established companies, ones that process at least $25,000 in credit card transactions per month. And he generally does deals in the $75,000-to-$100,000 range.

Also, to minimize that risk, Woy takes what he considers an ethical stand. He never does a deal that requires a merchant to use more than 12 percent of total cash flow to pay him back. Anything more than that, and the merchant would likely struggle to make payments. Ethical? Maybe. But it also makes good business sense. "We'll never get rich

Exhibit A-1

on one client or one deal," Woy says. "So we need to make every deal fair for all the parties involved. I never want to extend money to a business that they can't pay us back."

More than 85 percent of Express Working Capital's clients come back for a second advance, once they've paid off their first. McSherry is among them. He took Woy's cash and used it to buy Wynnwood, a catering company, and did the Mi Piaci deal, and now he's using Woy's money to help Santa Fe chef Eric di Stefano open a restaurant in Preston Center, with a second location to follow. "We could have done just one restaurant," McSherry says. "But with Brad's money, we realized we could do two."

Pyles is also a repeat customer. He's now leveraging Woy's cash to fund a potential new project in Dallas. The reason Pyles is coming back: because Woy has taken the time to understand the way the chef does business and has structured unique deals for him. In other words, Pyles isn't afraid that Brad Woy is going to break his thumbs. "Brad doesn't feel like my banker," Pyles says. "He feels like family."

*Write to joeguinto@gmail.com (mailto:joeguinto@gmail.com).*

**Read This Next**





(http://frontburner.dmagazine.com/2015/04/17/just-asking-how-many-big-box-stores-does-dallas-need/)
Just Asking: How Many Big-Box Stores Does Dallas Need?
(http://frontburner.dmagazine.com/2015/04/17/just-asking-how-many-big-box-stores-does-dallas-need/)

(http://frontburner.dmagazine.com/2015/04/14/al-jazeera-america/)
The Sad Life of Al Jazeera America
(http://frontburner.dmagazine.com/2015/04/14/al-jazeera-america/)

(http://frontburner.dmagazine.com/2014/05/06/last-night-sir-richard-branson-joined-the-love-field-debate-drank-tequila-and-talked-to-us/)
Last Night, Sir Richard Branson Joined the Love Field Debate, Drank Tequila, and Talked To Us
(http://frontburner.dmagazine.com/2014/05/06/last-night-sir-richard-branson-joined-the-love-field-debate-drank-tequila-and-talked-to-us/)

Exhibit A-1

UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Curtis | Castillo PC 2147522222

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
Curtis | Castillo PC
901 Main Street
Suite 6515
Dallas, TX 75202
USA

**FILING NUMBER:** 13-0022899105
**FILING DATE:** 07/18/2013    02:36 PM
**DOCUMENT NUMBER:** 490722230002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| MP Concepts 2, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 8411 Preston Rd. Suite 132 | Dallas | TX | 75225 | USA |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Curtis | Stephanie | D | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 901 Main Street, Suite 6515 | Dallas | TX | 75202 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
Upon all goods, wares and/or inventory, equipment, fixtures, furniture, improvements, intellectual property, and all other personal property of Debtor and all products and proceeds therefrom whether now in existence or hereafter acquired by Debtor, including Debtor's website, website passwords and hosting, general intangibles, including, without limitation, all trademarks and trade names, trade dress, the name "Mi Piaci", recipes, intellectual property, and menu items and proprietary cocktail names and formulas, Debtor's business telephone numbers, and all products and proceeds therefrom whether now in existence or hereafter acquired by Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:                          6b. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility    ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

Exhibit 5

Exhibit A-1

**UCC FINANCING STATEMENT**

**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Curtis | Castillo PC 2147522222

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Curtis | Castillo PC
901 Main Street
Suite 6515
Dallas, TX 75202
USA

**FILING NUMBER:** 13-0022900269
**FILING DATE:** 07/18/2013    02:38 PM
**DOCUMENT NUMBER:** 490722230003
**FILED: Texas Secretary of State**
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME** - Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Black Consultants & Associates, Inc.** | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **5940 Royal Palm Drive** | **Plano** | **TX** | **75093** | **USA** |

**2. DEBTOR'S NAME** - Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| **Curtis** | **Stephanie** | **D** | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **901 Main Street, Suite 6515** | **Dallas** | **TX** | **75202** | **USA** |

**4. COLLATERAL:** This financing statement covers the following collateral:
Upon all intellectual property and all products and proceeds therefrom whether now in existence or hereafter acquired by Debtor, including Debtor's website, website passwords and hosting, general intangibles, including, without limitation, all trademarks and trade names, trade dress, the name "Mi Piaci", recipes, intellectual property, and menu items and proprietary cocktail names and formulas, Debtor's business telephone numbers, and all products and proceeds therefrom whether now in existence or hereafter acquired by Debtor.

**5.** Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check <u>only</u> if applicable and check <u>only</u> one box.
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**

FILING OFFICE COPY

Exhibit A-1

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>    Curtis \| Castillo PC 2147522222 | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address)<br>    Curtis \| Castillo PC<br>    901 Main Street<br>Suite 6515<br>    Dallas, TX 75202<br>    USA | **FILING NUMBER:** 13-0022901159<br>FILING DATE: 07/18/2013    02:40 PM<br>DOCUMENT NUMBER: 490722230004<br>FILED: Texas Secretary of State<br>IMAGE GENERATED ELECTRONICALLY FOR WEB FILING<br>THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY |

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| OR | 1a. ORGANIZATION'S NAME<br>**Black Restaurant Management Group, LLC** | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS<br>**14854 Montfort Drive** | CITY<br>Dallas | STATE<br>TX | POSTAL CODE<br>75254 | COUNTRY<br>USA |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| OR | 2a. ORGANIZATION'S NAME | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| OR | 3a. ORGANIZATION'S NAME | | | |
| | 3b. INDIVIDUAL'S SURNAME<br>**Curtis** | FIRST PERSONAL NAME<br>**Stephanie** | ADDITIONAL NAME(S)/INITIAL(S)<br>**D** | SUFFIX |
| 3c. MAILING ADDRESS<br>**901 Main Street, Suite 6515** | CITY<br>**Dallas** | STATE<br>**TX** | POSTAL CODE<br>**75202** | COUNTRY<br>**USA** |

4. COLLATERAL: This financing statement covers the following collateral:
Upon all intellectual property and all products and proceeds therefrom whether now in existence or hereafter acquired by Debtor, including Debtor's website, website passwords and hosting, general intangibles, including, without limitation, all trademarks and trade names, trade dress, the name "Mi Piaci", recipes, intellectual property, and menu items and proprietary cocktail names and formulas, Debtor's business telephone numbers, and all products and proceeds therefrom whether now in existence or hereafter acquired by Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box. |
|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

Exhibit A-1

## SECURITY AGREEMENT

This Security Agreement (this "Agreement") dated the 18 day of June, 2013, is made by and between MP Concepts 2, LLC, a Texas limited liability company ("Debtor"), Black Restaurant Management Group, LLC, a Texas limited liability company ("Co-Debtor"), and Stephanie D. Curtis, an individual ("Lender").

## R E C I T A L S:

A.     Lender has committed to advance funds and/or has advanced funds to Debtor under that certain Revolving Line of Credit   dated of even date herewith (as may be amended, restated or otherwise modified from time to time, the "Revolver"), in the principal amount of Two Hundred Thousand and No/100 Dollars ($200,000.00)

B.     As a condition to Lender's advancing funds to Debtor under the Revolver, Lender has requested that Debtor and Co-Debtor grant security interests in the Collateral (as defined herein below).

C.     As a material inducement for Lender to extend the credit pursuant to the terms of the Revolver, Debtor and Co-Debtor have agreed to enter into this Agreement granting a security interest in the Collateral in favor of Lender as security for payment and performance of the Obligations as set forth in the Revolver and as defined in this Agreement.

## A G R E E M E N T:

NOW, THEREFORE, in consideration of the premises and in order to induce Lender to advance funds under the Revolver, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Debtor and Co-Debtor agree and covenant with Lender as follows:

1.     Definitions.    All capitalized terms used but not defined in this Agreement shall have the respective meanings given to such terms in the Revolver.   Notwithstanding the foregoing sentence, terms used in Article 9 of the Uniform Commercial Code (the "Code") in the State of Texas, when used in this Agreement, have the definitions given to such terms in the Code.

2.     Debtor's <u>Grant of Security</u>.  Debtor assigns, pledges and grants to Lender for her benefit, a continuing security interest in all of Debtor's right, title and interest in and to the following (collectively, the "Collateral"), whether now owned or hereafter acquired:

Any and all Goods, wares, Inventory, Equipment, Fixtures, furniture, improvements, , and all other personal property and all products and proceeds therefrom whether now in existence or hereafter acquired, including, without limitation, websites, website passwords and hosting, general intangibles, the name "Mi Piaci," business telephone numbers, and all products and proceeds therefrom whether now in existence or hereafter acquired by Debtor.

-1-

Exhibit 6

Exhibit A-1

3.    <u>Co-Debtor and Debtor's Grant of Security</u>.  Debtor and Co-Debtor assign, pledge and grant to Lender for her benefit, a continuing security interest in all of Debtor and Co-Debtor's right, title and interest in and to the following (collectively, the "Collateral"), whether now owned or hereafter acquired:

Any and all Intellectual Property, including, without limitation, trademarks (whether or not filed with the United States Patent and Trademark Office and/or Secretary of State for any state in the United States), patents, trade secrets, licenses, permits, labels, logos, designs, trade-names, service marks, recipes, food preparation techniques, ingredient lists, cocktail names and formulas, menu designs, menu concepts, restaurant designs, restaurant concepts, business processes, as well as any other intellectual property, including, without limitation, derivative works of or from the Intellectual Property.

Any and all materials, supplies, equipment, systems, apparatus, and other items now owned or hereafter acquired by Debtor or Co-Debtor, installed in, or used in connection with (temporarily or permanently) any of the improvements or the Premises (as defined below) which are now owned or hereafter acquired by Debtor or Co-Debtor including, but not limited to, any and all partitions, dynamos, window screens and shades, draperies, rugs and other floor coverings, awnings, and the proceeds thereof.

All of the right, title, and interest of Debtor and/or Co-Debtor in and to; (i) furniture, furnishings, equipment, machinery, tangible personal property, and goods located within, used in the operation of or derived from the restaurant operated at 8411 Preston Road, Dallas Texas 75225, located in the building known as Berkshire Court, Suites 132 and 232 (the "Premises"), or improvements, (ii) general intangibles (including payment intangibles), money, insurance proceeds, accounts, contract and subcontract rights, trademarks, trade names, copyrights, monetary obligations, chattel paper (including electronic chattel paper), instruments, investment property, documents, letter of credit rights, inventory and commercial tort claims; (iii) all cash funds, fees (whether refundable, returnable, or reimbursable) deposit accounts or other funds or evidences of cash, credit or indebtedness deposited by or on behalf of Debtor and/or Co-Debtor with any governmental agencies, boards, corporations, providers of utility services, public or private, including specifically, but without limitation, all refundable, returnable, or reimbursable tap fees, utility deposits, commitment fees and development costs, any awards, remunerations, reimbursements, settlements, or compensation heretofore made or hereafter to be made by any governmental authority pertaining to the Premises, improvements, fixtures or personalty, including but not limited to those for any vacation of, or change of grade in, any streets affecting the Premises or the improvements and those for municipal utility district or other utility costs incurred or deposits made in connection with the Real Property; and (iv) all other personal property of any kind or character as defined in and subject to the provisions of the Code (Article 9 - Secured Transactions); any and all of which are now owned or hereafter acquired by Debtor or Co-Debtor, and which are now or hereafter situated in, on, or about the Premises or the improvements, or used in or necessary to the complete and proper use, occupancy, or

-2-

Exhibit A-1

operation thereof, or acquired (whether delivered to the Premises or stored elsewhere) for use in or on the Premises or the improvements, together with all accessions, replacements, and substitutions thereto or therefor and the proceeds thereof.

Debtor and Co-Debtor shall be deemed to have possession of any of the Collateral in transit to it or set apart for it or for any of their agents, affiliates or correspondents.

Furthermore, it is understood and agreed that neither Debtor nor Co-Debtor is granting or conveying any interest in any portion of the Real Property itself, and any property that has become a fixture is not included within the granting of a lien or encumbrance pursuant to the security interested created by this Agreement.

4.    Security for Obligations.  This Agreement and the security interest created secure the prompt and complete payment, observance and performance of all duties, liabilities, obligations and indebtedness of Debtor and Co-Debtor arising under (a) the Revolver, (b) all costs reasonably incurred by Lender to obtain, preserve, perfect and enforce the security interest granted by this Agreement, and to maintain, preserve and collect the Collateral, and all taxes, assessments, insurance premiums, reasonable attorneys' fees and legal expenses, rent, storage charges, advertising costs, brokerage fees and expenses of sale, (c) all renewals, extensions and modifications of the obligations referred to in the foregoing clauses, or any part thereof, (d) this Agreement, and (e) all other obligations and indebtedness owed by Debtor and Co-Debtor to Lender (all such obligations and indebtedness is hereinafter referred to as the "Obligations").

5.    Representations and Warranties.  Debtor and Co-Debtor represent and warrant as follows:

(a)    Debtor and Co-Debtor own the Collateral free and clear of any lien, security interest, charge or encumbrance of any kind whatsoever (collectively, "Liens") except for the security interest created by this Agreement in favor of Lender.  No effective financing statement, continuation statement or amendment thereto promulgated under the Uniform Commercial Code of any state (collectively, "Financing Statements") or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of Lender or in favor of Viewpoint Bank, N.A., or Dallas Berkshire Partners, Ltd., (the "Permitted Liens").  The validity of the Collateral in whole or in part or Debtor and Co-Debtor's title thereto is not currently being questioned in any litigation or regulatory proceeding to which Debtor and/or Co-Debtor is a party, nor is any such litigation or proceeding threatened.

(b)    The Loan Documents create a valid security interest in the Collateral, securing the payment and/or performance of the Obligations, and all filings and other actions of Debtor and Co-Debtor  necessary or desirable to perfect such security interest have been, or will be upon Lender's request, duly taken by Debtor and Co-Debtor .

(c)    No authorization, approval or other action by, and no notice to or other filing with, any governmental authority or regulatory body is required, either (i) for the

-3-

Exhibit A-1

grant by Debtor and Co-Debtor of the security interest granted by this Agreement or for the execution, delivery or performance of this Agreement by Debtor and Co-Debtor, or (ii) for the perfection of or the exercise by Lender of her rights and remedies hereunder (other than the filing of Financing Statements by Lender and other than the laws, rules and regulations of the governing commissions and authorities of each jurisdiction in which Debtor and Co-Debtor is licensed to do business).

6.      Covenants and Further Assurances.

(a)      Debtor and Co-Debtor agree that, from time to time and at their sole expense, Debtor and Co-Debtor shall promptly execute and deliver all further instruments and documents, and shall take all further action, that may be reasonably necessary or desirable, or that Lender may request, in order to perfect and protect any security interest granted or purported to be granted by this Agreement or to enable Lender to exercise and enforce rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, Debtor and Co-Debtor will, upon Lender's request, execute and file such Financing Statements, and such other instruments or notices, as may be necessary or desirable, or as Lender may request, in order to perfect and preserve the security interest granted or purported to be granted by this Agreement.

(b)      Debtor and Co-Debtor authorizes Lender to file one or more Financing Statements relative to all or any part of the Collateral without the signature of Debtor and/or Co-Debtor here permitted by law. A carbon, photographic or other reproduction of this Agreement or any Financing Statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law. Debtor and Co-Debtor acknowledge and agree that any Financing Statement filed by or on behalf of Lender against Debtor and/or Co-Debtor, whether such filing is or was made prior to or after the date of this Agreement, is deemed to include the security interest granted by this Agreement, regardless of whether such Financing Statement is or was filed in connection with the Revolver or some other indebtedness owed to Lender.

7.      Transfers and Other Liens. Debtor and Co-Debtor shall not:

(a)      sell, assign (by operation of law or otherwise) or otherwise dispose of any of the Collateral without the prior written approval of Lender; or

(b)      create or suffer to exist any Lien upon or with respect to any of the Collateral to secure debt of any person, except for the security interest created by this Agreement and Permitted Liens.

8.      Lender Appointed Attorney-in-Fact. Debtor and Co-Debtor irrevocably appoint Lender as their attorney-in-fact, with full authority in the place and stead of Debtor and/or Co-Debtor, as applicable, and in the name of Debtor and Co-Debtor, as applicable, or otherwise, from time to time in Lender's discretion at any time after the occurrence of a Default (as defined herein), to take any action and to execute any instrument which Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

-4-

Exhibit A-1

(a) to file any claims or take any action or institute any proceedings which Lender may deem necessary or desirable to enforce the rights of Lender with respect to any of the Collateral;

(b) to commence and prosecute any actions in any court for the purposes of collecting amounts owed to Debtor and/or Co-Debtor with respect to the Collateral and enforcing any other rights in respect thereof, and to defend, settle or compromise any action brought and, in connection therewith, and to give such discharge or release as Lender may deem appropriate;

(c) sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Collateral as fully and completely as though Lender were the absolute owner thereof for all purposes;

(d) to execute Financing Statements or any other documents or writing deemed necessary by Lender to evidence or perfect Lender's security interest in the Collateral; provided that Lender agrees to furnish copies of any document executed hereunder to the appropriate Debtor and Co-Debtor , as applicable, upon request; and

(e) to enter on the premises of Debtor and Co-Debtor upon prior reasonable written notice in order to exercise any of Lender's rights and remedies.

The foregoing appointment of Lender as attorney-in-fact is coupled with an interest and is irrevocable.

9. <u>Lender May Perform</u>. If Debtor and/or Co-Debtor fail to perform any covenant or agreement contained in this Agreement that would otherwise result in an Event of Default, Lender may herself perform, or cause performance of, such covenant or agreement, and the expenses of Lender incurred in connection therewith shall be payable by Debtor and Co-Debtor upon demand.

10. <u>Lender's Duties</u>. The powers conferred on Lender under this Agreement are solely to protect her interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in her possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

11. <u>Events of Default</u>. Each of the following events constitutes a Default (herein so called) under this Agreement:

(a) any Event of Default occurs under the terms of the Revolver; or

(b) any breach by Debtor and/or Co-Debtor of their obligations under this Agreement.

Exhibit A-1

12.    Remedies. If any Default shall occur and be continuing, Lender may protect and enforce her rights under this Agreement and the Revolver by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained therein, and Lender may enforce the payment and/or performance of any Obligations due it or enforce any other legal or equitable right which it may have. All rights, remedies and powers conferred upon Lender under the Revolver and this Agreement shall be deemed cumulative and not exclusive of any other rights, remedies or powers available under the Revolver, this Agreement or at law or in equity. Lender's authority and rights shall include, without limitation, the following:

(a)    Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to her, all the rights and remedies of a secured party on default under the Code (whether or not the Code applies to the affected Collateral) and also may (i) require Debtor and/or Co-Debtor to, and Debtor and Co-Debtor agrees that they will at their expense and upon request of Lender forthwith, assemble all or part of the Collateral as directed by Lender and make it available to Lender at a place to be designated by Lender which is reasonably convenient to her, (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Lender may deem commercially reasonable, and (iii) may retain all Payments and apply them against the Obligations. Debtor and Co-Debtor agree that, to the extent notice of sale shall be required by law, at least ten (10) business days' notice to Debtor and Co-Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. In exercising any remedies, Lender shall comply with UCC Article 9 and nothing in this Security Agreement is intended to contradict the duties of Lender thereunder.

(b)    All cash proceeds received by Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of Lender, be held by Lender as collateral for, and/or then or at any time thereafter applied in whole or in part by Lender against all or any part of the Obligations in such order as Lender shall elect, subject to any mandatory provisions of this Agreement or applicable law. Any surplus of such cash or cash proceeds held by Lender and remaining after payment in full of all the Obligations shall be paid over to Debtor and Co-Debtor or to whomsoever may be lawfully entitled to receive such surplus.

13.    No Impairment. The execution and delivery of this Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the payment of the Obligations and no security taken hereafter as security for payment of the Obligations shall impair in any manner or affect this Agreement, all such present and further additional security to be considered as cumulative security. Any of the Collateral for, or any obligor on, any of the

-6-

Exhibit A-1

Obligations may be released without altering, varying or diminishing in any way the force, effect, lien, security interest, or charge of this Agreement as to the Collateral not expressly released, and this Agreement shall continue as a security interest and charge on all of the Collateral not expressly released until all the Obligations secured by this Agreement have been paid in full. This Agreement shall not be construed as relieving Debtor and Co-Debtor from full recourse liability on the Obligations and any and all further and other indebtedness secured by this Agreement and for any deficiency thereon.

14.    Indemnity and Expenses.

(a)    Debtor and Co-Debtor agree to indemnify Lender from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from Lender's gross negligence or willful misconduct.

(b)    Debtor and Co-Debtor will upon demand pay to Lender the amount of any and all reasonable, documented expenses, including the reasonable fees and disbursements of her counsel and of any experts and agents, which Lender may incur in connection with (i) the custody, preservation of, use or operation of, or the sale of, collection from, or other realization upon, any of the Collateral, (ii) the exercise or enforcement of any of the rights of Lender hereunder, or (iii) the failure by Debtor and/or Co-Debtor to perform or observe any of the provisions hereof.

15.    Security Interest Absolute. All rights of Lender and security interests hereunder, and all obligations of Debtor and/or Co-Debtor hereunder, shall be absolute and unconditional, irrespective of:

(a)    any lack of validity or enforceability of the Revolver or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of or any consent to any departure from the Revolver;

(c)    any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; or

(d)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, Debtor and Co-Debtor, or a third party holder of a security interest.

16.    Notice. All notices and other communications under this Agreement will be in writing and will be mailed by registered or certified mail, postage prepaid, sent by facsimile, delivered personally by hand, or delivered by nationally recognized overnight delivery service addressed to Lender at the address provided as the Place of Payment under the Revolver, or, with

-7-

Exhibit A-1

respect to Debtor and/or Co-Debtor, addressed to Debtor and Co-Debtor at the Maker's Mailing Address under the Revolver, or to such other address as a party may have delivered to the other parties for purposes of notice. Each notice or other communication will be treated as effective and as having been given and received (a) if sent by mail, at the earlier of its receipt or three business days after such notice or other communication has been deposited in a regularly maintained receptacle for deposit of United States mail, (b) if sent by facsimile, upon confirmation of facsimile transfer, (c) if delivered personally by hand, upon written confirmation of delivery from the person delivering such notice or other communication, or (d) if sent by nationally recognized overnight delivery service, upon written confirmation of delivery from such service.

17. <u>Continuing Security Interest</u>. This Agreement shall create a continuing security interest in the Collateral. Upon the payment in full of the Obligations, the security interest granted by this Agreement shall terminate. Upon any such termination, Lender will, at Debtor and Co-Debtor's expense, execute and deliver to Debtor and Co-Debtor such documents as Debtor and Co-Debtor shall reasonably request to evidence such termination.

18. <u>Mutual Understanding</u>. Debtor and Co-Debtor represents and warrants to Lender that Debtor and Co-Debtor have read and fully understands the terms and provisions hereof, have had an opportunity to review this Agreement with legal counsel and have executed this Agreement based on Debtor and Co-Debtor's own judgment and advice of counsel. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of authorship of any provision of this Agreement.

19. <u>Further Assurances</u>. Debtor and Co-Debtor at Debtor and Co-Debtor's expense will promptly execute and deliver to Lender on Lender's request, all such other and further documents, agreements and instruments, and shall deliver all such supplementary information, in compliance with or accomplishment of the agreements of Debtor and Co-Debtor under this Agreement, the Revolver, and the other Loan Documents, if any.

20. <u>Cumulative Remedies</u>. Debtor and Co-Debtor agree that all rights and remedies that Lender is afforded by reason of this Agreement are separate and cumulative with respect to Debtor and Co-Debtor and otherwise and may be pursued separately, successively, or concurrently, as Lender deems advisable. In addition, all such rights and remedies of Lender are non-exclusive and shall in no way limit or prejudice Lender's ability to pursue any other legal or equitable rights or remedies that may be available to Lender.

21. <u>Enforcement and Waiver by Lender</u>. Lender shall have the right at all times to enforce the provisions of this Agreement, the Revolver, and the other Loan Documents (if any) in strict accordance with their respective terms, notwithstanding any conduct or custom on the part of Lender in refraining from so doing at any time or times. The failure of Lender at any time or times to enforce her rights under such provisions, strictly in accordance with the same, shall not be construed as having created a custom or in any way or manner modified or waived the same. All rights and remedies of Lender are cumulative and concurrent and the exercise of one right or remedy shall not be deemed a waiver or release of any other right or remedy.

-8-

Exhibit A-1

22.  **CHOICE OF LAW; JURISDICTION; BINDING ARBITRATION.**

(A)  EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF SECURITY INTERESTS OR REMEDIES IN RESPECT OF ANY PARTICULAR COLLATERAL IS GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF TEXAS, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PROVISIONS. JURISDICTION FOR ALL MATTERS ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE EXCLUSIVELY IN THE STATE AND FEDERAL COURTS SITTING IN DALLAS COUNTY, TEXAS, AND DEBTOR AND CO-DEBTOR IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF SUCH STATE AND FEDERAL COURTS AND AGREES AND CONSENTS NOT TO ASSERT IN ANY PROCEEDING, THAT ANY SUCH PROCESS IS BROUGHT IN AN INCONVENIENT FORUM OR THAT THE VENUE THEREOF IS IMPROPER, AND FURTHER AGREES TO A TRANSFER OF SUCH PROCEEDING TO THE COURTS SITTING IN DALLAS COUNTY, TEXAS.

(b)  If the parties are unable to resolve their disputes or controversies arising out of or relating to this Agreement or the performance, breach, validity, interpretation or enforcement of this Agreement, all such disputes and controversies will be resolved by binding arbitration in accordance with the United States Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"), and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. A party shall initiate arbitration by sending written notice of its intention to arbitrate to the other party and to the AAA office located in Dallas, Texas. Parties shall have the same period of time to file claims as provided by the applicable statute of limitation for such claim. Such written notice will contain a description of the dispute and the remedy sought. The arbitration will be conducted at the offices of the AAA in Dallas, Texas before an independent and impartial arbitrator acceptable to the parties. If the parties have not mutually agreed on an acceptable arbitrator within thirty (30) days after the demand for arbitration is filed, the arbitrator shall be appointed in the manner provided by the Commercial Arbitration Rules of the AAA. The decision of the arbitrator will be final and binding on the parties and their successors and assignees. Where consistent with applicable law, the arbitrator shall order the non-prevailing party to pay the prevailing party's attorney's fees and all costs of the arbitration. The parties will participate in good faith in a non-binding mediation of their dispute at least 60 days prior to the date of the arbitration hearing. The parties shall jointly select the mediator but if they are unable to agree on a mediator, then the arbitrator shall appoint the mediator. The parties intend that this agreement to arbitrate be irrevocable.

23.  <u>Severability</u>. If any provision of this Agreement, the Revolver or any other Loan Document shall be held invalid under any applicable laws, then all other terms and provisions of

-9-

Exhibit A-1

this Agreement, the Revolver and the other Loan Documents (if any) shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

24.    Amendments; Waivers.    No amendment or waiver of any provision of this Agreement nor consent to any departure by Debtor and/or Co-Debtor herefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and the affected Debtor and/or Co-Debtor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Debtor and Co-Debtor may not be released from Debtor and/or Co-Debtor's obligations hereunder, except pursuant to a written instrument executed by Lender.

25.    Binding Effect; Assignment.  This Agreement shall be binding on Debtor and Co-Debtor and Debtor and Co-Debtor's administrators, other legal representatives, successors, heirs and assigns, including, without limitation, any receiver, trustee or debtor in possession of and/or for Debtor and/or Co-Debtor, and shall inure to the benefit of Lender and her successors and assigns.  Debtor and Co-Debtor shall not be entitled to transfer or assign this Agreement in whole or in part without the prior written consent of Lender.  This Agreement is freely assignable and transferable by Lender without the consent of Debtor and/or Co-Debtor.  Should the status, composition, structure or name of Debtor and/or Co-Debtor change, this Agreement shall continue and also cover Debtor and/or Co-Debtor under the new status composition, structure or name according to the terms of this Agreement,

26.    Counterparts.  This Agreement may be executed in any number of multiple counterparts and by Debtor and Co-Debtor on separate counterparts, all of which when taken together shall constitute but one and the same instrument.

27.    Captions.  The captions in this Agreement are for the convenience of reference only and shall not limit or otherwise affect any of the terms or provisions hereof.

28.    Number of Gender of Words.  Except where the context indicates otherwise, words in the singular number will include the plural and words in the masculine gender will include the feminine and neutral, and vice versa, when they should so apply.

**29.    WAIVER OF PUNITIVE DAMAGES, ETC. DEBTOR AND CO-DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY (A) WAIVE, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH ARBITRATION ANY "SPECIAL DAMAGES," AS DEFINED BELOW, (B) CERTIFY THAT NO PARTY NOR ANY REPRESENTATIVE OF LENDER OR COUNSEL FOR ANY PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF ARBITRATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (C) ACKNOWLEDGE THAT LENDER CONTINUES TO BE INDUCED TO PERFORM UNDER THIS AGREEMENT, THE REVOLVER AND THE OTHER LOAN DOCUMENTS (IF ANY) AND THE TRANSACTIONS CONTEMPLATED THEREBY BY AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION. AS USED IN THIS SECTION,**

-10-

Exhibit A-1

"SPECIAL DAMAGES" INCLUDES ALL SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES (REGARDLESS OF HOW NAMED), BUT DOES NOT INCLUDE ANY PAYMENTS OR FUNDS WHICH ANY PARTY HAS EXPRESSLY PROMISED TO PAY OR DELIVER TO ANY OTHER PARTY.

    30.   <u>ENTIRE AGREEMENT</u>. THIS AGREEMENT, THE REVOLVER AND THE OTHER LOAN DOCUMENTS (IF ANY) TOGETHER CONSTITUTE THE ENTIRE AGREEMENT AMONG THE PARTIES CONCERNING THE SUBJECT MATTER HEREOF, AND ALL PRIOR DISCUSSIONS, AGREEMENTS AND STATEMENTS, WHETHER ORAL OR WRITTEN, ARE MERGED INTO THIS AGREEMENT, THE REVOLVER AND THE OTHER LOAN DOCUMENTS (IF ANY). THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES AND THIS AGREEMENT, THE REVOLVER AND THE OTHER LOAN DOCUMENTS (IF ANY) MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

*[signature page follows]*

Exhibit A-1

IN WITNESS WHEREOF, Debtor and Co-Debtor have caused this Agreement to be duly executed and delivered as of the date first above written.

**DEBTOR:**
**MP Concepts 2, LLC, a Texas limited liability company**

By: _____

Its: _Managing Member_____

**CO-DEBTOR:**
**Black Restaurant Management Group, LLC, a Texas limited liability company**

By: _____

Its: _PRESIDENT_____

**LENDER:**

_____
Stephanie D. Curtis

-12-

Exhibit A-1

## SCHEDULE 1

### **PERMITTED LIENS**

Viewpoint Bank, N.A.

Dallas Berkshire Partners, Ltd.

-13-

Exhibit A-1